**LEKTRO-VEND CORPORATION, a Delaware corporation, Ann Stoner, As Administrator of the Estate of Harry B. Stoner, Deceased, and Stoner Investments, Inc., a Delaware corporation, Plaintiffs-Appellants,**

v.

**The VENDO COMPANY, a Missouri Corporation, Defendant-Appellee.**

No. 80–2120.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1981.

Decided Aug. 27, 1981.

Certiorari Denied Jan. 25, 1982. See 102 S.Ct. 1277.

James E. S. Baker, Sidley & Austin, Chicago, Ill., for plaintiffs-appellants.

Earl E. Pollack, Chicago, Ill., for defendant-appellee.

Before PELL, Circuit Judge, MARKEY,* Chief Judge, and WOOD, Circuit Judge.

PELL, Circuit Judge.

This appeal represents the culmination of nearly sixteen years of litigation over complex antitrust issues at all levels of the Illinois and federal court systems. In this most recent appeal, the plaintiffs contest the district court's findings that a certain acquisition by the defendant company in 1959, and the concomitant execution of covenants not to compete, did not violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and § 7 of the Clayton Act, 15 U.S.C. § 18.

*The Parties*

The plaintiffs in this case are Lektro-Vend Corporation (Lektro-Vend) and Stoner Investments, Inc. (Stoner Investments), both Delaware corporations, and Ann Stoner, Administrator of the estate of Harry B. Stoner.[1] Harry Stoner (Stoner), an innovative design genius in the vending machine manufacturing industry, was president and controlling owner of Stoner Manufacturing Corporation (Stoner Manufacturing) prior to its 1959 sale to the Vendo Company (Vendo). Stoner Manufacturing primarily manufactured and marketed candy vending machines. The defendant, Vendo, is a Missouri corporation which manufactures and markets various types of vending machines. After the 1959 sale, Stoner held the office of president of Vendo's Aurora, Illinois Division until June 1, 1964. He also served as a Vendo director from May 28, 1959 to April 21, 1964.

Plaintiff Lektro-Vend was developed with Harry Stoner's assistance beginning in 1961 to manufacture candy and snack pastry vending machines. It was formally incorporated in September, 1963. Plaintiff Stoner Investments, successor to Stoner Manufacturing, is a real estate and investment company which owns almost 80% of Lektro-Vend's stock. Stoner Investments was wholly owned by Harry and Ann Stoner prior to Harry Stoner's death.

*Vendo's 1959 Acquisition of Stoner Manufacturing*

Vendo primarily manufactured beverage and ice cream vending machines prior to 1959. By that time, Vendo was a leading vending machine manufacturer and was considering expanding its product line to include several types of machines it did not then manufacture including a candy machine. Stoner Manufacturing had previously approached Vendo in 1955 to suggest that Vendo acquire Stoner Manufacturing, but those negotiations had proved fruitless. In October 1958, prompted by Harry Stoner's failing health and the death of Stoner Manufacturing's executive vice-president, Clarence Adelberg, Stoner Manufacturing again initiated negotiations with Vendo. In an affidavit submitted to the Federal Trade Commission to gain premerger clearance, Stoner explained his reasons for selling the business:

> The stock of the Corporation is owned by four members of our family. There are 870 shares outstanding, of which I own 245 and my wife owns 155.
>
> . . . . .
>
> My own health has never been robust. . . . Nevertheless, I had always felt able to, and had, managed the business without difficulty until the death of Clarence R. Adelberg. . . . Since his death there has been a void in management which has not yet been filled.
>
> . . . . .
>
> . . . I am concerned because the principal asset of each of the stockholders is his Stoner Mfg. Corp. stock. I feel that the strain of my responsibility is too great in the present state of my health. .
>
> . . . . .
>
> Vendo seemed to be a logical purchaser because no other prospective purchaser had any management people capable of

---

* Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

1. Harry B. Stoner, who initiated this lawsuit in 1965, died on March 28, 1976. His wife, Ann Stoner, as personal representative, was substituted as party plaintiff.

running the business without being educated in the vending machine field. Vendo being experienced in that field will be able to take over with less assistance from me.

I am interested in having the business continued, by people who have capable management and who will continue to employ and be compatible with our present officers and employees and with a minimum of dislocation of business practices and employment security. I do not want to let the business just drift and carry on of its own momentum because this cannot continue indefinitely and there is great risk of loss involved in such a program. . . .

The district court found that Vendo acquired Stoner Manufacturing to expand its line of vending machines.[2] Robert Wagstaff, Vendo's chief negotiator in the acquisition, testified at trial that:

[W]e wanted to acquire its candy machine and add it to our line. We liked the capabilities that Stoner Manufacturing represented in connection with some other plans, although it mainly was a desire on our part to enlarge the line of equipment so that we could take care of this demand for full line vending, which was a very real thing in those days. We thought that was the main—that was the main reason for our acquiring to [sic] Stoner.

We thought Harry Stoner would be an asset to our board of directors. He had a fine reputation in the industry, and we thought the name on his equipment was helpful.

On April 3, 1959, Vendo and Stoner Manufacturing entered into a sales contract. Vendo purchased Stoner Manufacturing's assets, including inventions, patents, drawings, designs, and research and development work, in exchange for $3,400,000 in cash and 60,000 shares of Vendo stock.[3] The acquisition agreement contained a covenant prohibiting Stoner Manufacturing from any affiliation with

any business engaged in the manufacture and sale of vending machines under any name similar to the Company's present name, and, for a period of ten (10) years after the closing, the Company will not in any manner, directly or indirectly, enter into or engage in the United States or any foreign country in which Vendo or any affiliate or subsidiary is so engaged, in the manufacture and sale of vending machines or any business similar to that now being conducted by the Company. . . . [and that Stoner Manufacturing will] co-operate with Vendo to prevent the use by others of the names "Stoner" and "Stoner Manufacturing Corp." in connection with any business similar to that now carried on by the Company and also agrees not to disclose to others, or make use of, directly or indirectly any formulae or process now owned or used by the Company.

An employment contract was executed on June 1, 1959, which provided that Stoner would serve as an officer or function in whatever other executive or advisory capacity Vendo requested, subject to his health limitations, for five years at an annual salary of $50,000. Stoner stipulated that he would also become a director of Vendo for no additional compensation. The employment contract included the following clause:

During the term of this agreement and for a period of five (5) years following

2. The plaintiffs argue that Vendo's purpose was not limited to a desire to expand its product line, but also included the intent to eliminate Stoner as a competitor. This contention will be discussed separately hereinafter.

3. The assets purchased excluded the land and property comprising the Stoner Manufacturing plant which were, instead, the subjects of a lease and option to purchase which Vendo exercised in 1961. Vendo was to pay Stoner (1) all profits in excess of $250,000 realized from the use of the assets purchased annually for a period of ten years or until Vendo exercised its option to buy the plant, and (2) for a period of ten years, 25% of the income derived from foreign production of the acquired machines. This last provision was subsequently modified by a 1962 compromise agreement between the parties which is not relevant to the issues in this case.

the termination of his employment hereunder, whether by lapse of time or by termination as hereinafter provided, Stoner shall not directly or indirectly, in any of the territories in which the Company or its subsidiaries or affiliates is at present conducting business and also in territories which Stoner knows the Company or its subsidiaries or affiliates intends to extend and carry on business by expansion of present activities, enter into or engage in the vending machine manufacturing business or any branch thereof, either as an individual on his own account, or as a partner or joint venturer, or as an employee, agent or salesman for any person, firm or corporation or as an officer or director of a corporation or otherwise, . . . [but this does not prevent Stoner from working for Vendo or trading in the investment securities market].

The contract provided that Stoner would regulate his own working hours "it being understood that the value of Stoner's services . . . are not measured by the amount of time or effort devoted to the business by Stoner but by the value of his advice and counsel in the operation of the Aurora, Illinois, facility, and his know-how, experience and reputation in the vending machine field."

The time span covered by the noncompetition covenants was identical to the period during which Vendo (1) had the option to purchase the Stoner Manufacturing plant, (2) was to pay a stipulated share of profits from the use of the acquired assets, and (3) was to pay out a specified share of income from foreign production of the acquired machinery.

*The Parties' Post-Acquisition Relationship*

Rising tensions between Harry Stoner and Vendo officers catalyzed the rapid disintegration of their relationship shortly after the acquisition was consummated. Stoner Manufacturing's engineering, research, and new product research and development departments, as well as executive control of operations, sales, and finance, were moved from Aurora, Illinois to Kansas City, Missouri, Vendo's principal place of business, soon after the acquisition and without consulting Harry Stoner. Thus, no executives in Stoner's division ever reported to Stoner as president of Vendo's Aurora Division. At a June 24, 1959, meeting, Vendo's then chief executive officer, Robert Wagstaff, advised Stoner that his post as president of the Aurora Division was advisory only. Although Vendo occasionally consulted Stoner regarding business problems,[4] he exercised few actual duties and felt that no one at Vendo heeded his advice. Consequently, Stoner refused to attend any board of directors' meetings during the first year and one-half following the acquisition.

As the district court found, Harry Stoner was particularly disappointed by Vendo's failure to place him on Vendo's Products Planning Committee. Wagstaff, however, testified that Vendo would have assigned Stoner to that Committee "if we could have ever gotten him to take an interest in the operation of the company."

The plaintiffs urge that these circumstances illustrate that Vendo hired Stoner primarily to shelve his genius: "Vendo was thus paying Stoner not to compete rather than employing him for the performance of actual services." Contrarily, as Wagstaff's testimony indicates, Vendo attributed the breakdown of the parties' relationship to Stoner's obstinacy:

Q: What tasks, if any, did you call upon Mr. Stoner to perform during the five years of his employment contract?

A: Well, very few. We did specifically request he attend directors meetings and take an interest in those meetings, and we asked his opinion on many matters of policy and things of that sort, and actually at the beginning we discussed changes that we desired to make with him in the plant and got his viewpoint, but Harry felt our viewpoint was so contrary to his that it got to the point that the discussions were just completely incompatible, and there was no point to having them.

4. The district court documents only four instances in which Vendo sought Stoner's assistance, although Vendo contends that "Stoner's advice was sought on many occasions. . . ."

They outraged him and got him upset, and so those things by attrition just sort of phase out, but not by policy. I think, thought, and still think that one of the difficulties in anything of that sort is getting people to agree, and I think Harry could have made quite a contribution to the operation if he had not been so irritated at us, which he was.

## The Creation and Development of Lektro-Vend

Rod Phillips and his son Bill, former Stoner Manufacturing engineers, resigned from Vendo in mid-1960. They subsequently succeeded in enlisting Stoner's support in their efforts to develop a new type of vending machine. Stoner Investments advanced approximately $200,000 in interest-free loans during 1961 and 1962, and also paid the Phillipses and two other former Stoner Manufacturing/Vendo employees monthly salaries aggregating $1,150. In addition, Stoner allowed them to use a building he owned rent-free. They subsequently designed the revolutionary Lektro-Vend "FIFO" (first in-first out) vending machine that featured stock rotation, a window permitting product display, and the capacity to stock mixed goods on a single conveyor. These features made the Lektro-Vend machine superior to the "drop-shelf" machine manufactured by Stoner Manufacturing at the time of the acquisition.[5] In October 1962, a prototype of the new machine was exhibited at a San Francisco trade show with positive results.

In December of the same year, Stoner's sister-in-law, Ruth Netrey, lent $350,000 to Phillips. This principal amount, later increased to $525,000, was used in part to repay Harry Stoner for his earlier advancements.

During that same month, Harry Stoner sought to be released from his employment contract with Vendo, citing his opportunity to invest in the new Lektro-Vend endeavor as the reason for his request. Stoner ap-parently did not then reveal his prior financial support for Lektro-Vend. Vendo rejected Stoner's request and instead directed Stoner to inquire whether Phillips would sell the machine to Vendo.

Stoner later reported that Rod Phillips would sell the machine for 1.5 million dollars, the amount which a third company was allegedly willing to pay. In March 1963, Stoner wrote Vendo that:

Rod Phillips has been inquiring with regards to Vendo's interest in his vending machine. I have advised him that, inasmuch as he had not heard from you, and that I had heard nothing further from you, that I felt that sufficient time had passed so that he could be relinquished of his promise to give Vendo first chance for acquiring it. I think that the future will show that this represents a serious mistake on your part, but, inasmuch as there are other people interested, Rod feels that he is obliged to investigate the depth of their interest in the near future.

Spencer Childers, a Vendo vice-president, replied that Vendo was still interested but would not pay the $1.5 million asking price. Instead, he suggested that Vendo pay all out-of-pocket expenses incurred in developing the machine plus a fair profit margin to the Lektro-Vend creators.

Childers, Stoner, and Phillips met in Aurora on April 30, 1963. During that meeting, Rod Phillips reiterated his request for $1.5 million. On May 17, 1963, Stoner wrote to Vendo chairman Elmer Pierson inquiring whether Pierson wanted him to take any further action, but Stoner received no response.

Pierson testified that Childers had ultimately reported "that he didn't think it would be advisable for our company to go on with the negotiations." When asked if Vendo declined the opportunity to purchase the Lektro-Vend machine because of its price, Pierson testified that "[a]pparently that was what the group decided at that time.... Apparently I was told that they

---

**5.** Although Vendo had attempted in 1959 to design a machine similar to the subsequently developed Lektro-Vend machine, its designs had proved impractical and Vendo discarded the project.

came to that conclusion, that it was too high."

In the spring or summer of 1963, Pierson asked Harry Stoner to explain his actual connection with Rod Phillips. Stoner replied that he had lent money to Phillips, but that the loan had been repaid by a third party.[6]

Lektro-Vend was formally organized as a corporation on September, 1, 1963. At about that time, Ruth Netrey's loan was repaid. Lektro-Vend's initial shareholders were Rod and Bill Phillips, a few other employees, and Netrey.

In March, 1964, Stoner Investments executed a contract to sell to Lektro-Vend a new plant it had completed building the previous year. Lektro-Vend financed the purchase with a bank loan secured by Stoner Investments' promise to repurchase the property in the event of default.

Stoner's position as Vendo director expired on April 1, 1964. His employment contract, which ended on June 1, 1964, was not renewed. Subsequently, on June 10, 1964, Lektro-Vend issued 5,000 shares of stock to Ann Stoner, and issued another 5,000 shares to Stoner Investments on July 15, 1964.

The following March, Stoner sent a letter endorsing Lektro-Vend to fifty vending machine operators which stated, in part, that:

> As you may know, my association with Stoner Mfg. Co. was terminated last year after 32 years as its President. I am now interested in the new LEKTRO–VEND CORP. . . .

> . . . . .

> . . . I am willing to risk my reputation as a vending machine designer and manufacturer to say that the LEKTRO–VEND products will set new highs in earnings to operators and will be the standard of comparison for the next 50 years.

The purpose of the letter was to allay rumors that Lektro-Vend hovered near the brink of financial collapse. Stoner sent a copy of the letter to Vendo's Elmer Pierson because Stoner believed that Lektro-Vend's recent set-backs were "primarily due to the tale of woe and gloom that your [Vendo's] salesmen have spread, right up to making flat statements that they have seen documentary proof that this company has filed bankruptcy." Pierson transmitted the letter to Vendo's general counsel, Glenn Carbaugh, noting that Stoner had gone "to[o] far."

*Previous Litigation*

Vendo filed a complaint in state court against Harry Stoner and Stoner Investments on August 10, 1965, alleging breach of noncompetition covenants and theft of trade secrets relating to the development of the Lektro-Vend machine. In their answer, Stoner and Stoner Investments claimed that the state court suit violated federal antitrust laws.[7] On December 16, 1966, after a bench trial, the state court found Harry Stoner liable for $250,000 in damages, and adjudged Stoner and Stoner Investments to be jointly liable for an additional $1,100,000. The court enjoined the defendants from further acts of competition.

On appeal, the Illinois Appellate Court, in *Vendo Co. v. Stoner*, 105 Ill.App.2d 261, 245 N.E.2d 263 (1969), ruled that Vendo had not

---

**6.** The district court's finding that "Stoner disclosed to Vendo that he had been loaning money to the Phillips, [sic] which loans had been paid back by Stoner's sister-in-law" might seem to imply that, at that time, Stoner revealed to Vendo the identity of the source of funds responsible for the repayment of his loan. But see the Illinois Supreme Court's finding that "Stoner did not disclose that this other person was his sister-in-law. This conversation marked the first occasion on which Stoner disclosed any involvement with Lektro-Vend, and the disclosure was far from complete."

*Vendo Co. v. Stoner*, 58 Ill.2d 289, 300, 321 N.E.2d 1, 7 (1974), *cert. denied*, 420 U.S. 975, 95 S.Ct. 1398, 43 L.Ed.2d 655 (1975). The district court noted that "[i]t appears, however, that Vendo had heard rumors of Stoner's involvement with Lektro-Vend as early as the 1962 trade show."

**7.** On October 21, 1965, the plaintiffs herein filed the instant suit against Vendo which laid dormant, pending resolution of the state court claims, until 1975.

proven theft of trade secrets, but that the covenants not to compete were enforceable and had been breached by the defendants, 105 Ill.App.2d 261, 288, 245 N.E.2d 263. The court determined that the trial court had incorrectly stricken the affirmative defense of violation of the federal antitrust laws, and remanded the case for a correct determination of damages and further proceedings. *Id.* at 291, 295–99, 245 N.E.2d 263.

Stoner and Stoner Investments, defendants in the state lawsuit, withdrew the antitrust defense on remand. The trial court this time entered a judgment against the defendants jointly for $7,345,500 plus costs, and against Harry Stoner individually for $170,835 plus costs. The Illinois Appellate Court again overturned the trial court's judgment and remanded for an assessment of damages in accordance with the appellate court's original opinion. 13 Ill.App.3d 291, 300 N.E.2d 632 (1973). This time the remand never materialized because, on appeal, the Illinois Supreme Court reversed the appellate court and affirmed the trial court's judgment on a theory neither advanced by Vendo nor relied upon by the trial court, *i. e.,* breach of fiduciary duty, 58 Ill.2d 289, 321 N.E.2d 1 (1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1398, 43 L.Ed.2d 655 (1975).

At this point the drama shifted to the federal courts. The plaintiffs in the present case (the state court defendants) sought a preliminary injunction to prevent Vendo from collecting the state court judgment pending resolution of the federal antitrust claims. On June 27, 1975, Judge McLaren granted the plaintiffs' motion finding that § 16 of the Clayton Act, 15 U.S.C. § 26, which provides for preliminary injunctive relief, was an expressly authorized exception to the Anti-Injunction Act, 28 U.S.C. § 2283, and alternatively, that the injunction was necessary in aid of the federal court's jurisdiction, a separate exception to § 2283. 403 F.Supp. 527, 536–37 (N.D.Ill.1975). The Seventh Circuit affirmed on the first ground. 545 F.2d 1050 (7th Cir. 1976). In a divided opinion, the United States Supreme Court reversed, ruling that the injunction was not authorized on either of the grounds relied upon by the trial court. 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977).

In June 1978, a bench trial on the merits of the federal antitrust claims finally commenced and continued for twenty-three days. The district court found in favor of the plaintiffs on collateral estoppel, *in pari delicto,* and statute of limitations issues, but ultimately rejected all of the antitrust claims.

In light of the gravity of the issues and the substantial commitment of the time and resources of all parties in this protracted litigation, we examine each of the appellants' claims in some detail. We will not review all of the findings of facts and conclusions of law at this juncture, however, but will discuss them separately hereinafter as they relate to each antitrust violation alleged.

*Standard of Review*

Pursuant to Fed.R.Civ.P. 52(a), this court is bound to uphold the district court's findings of fact unless clearly erroneous and cannot weigh complex antitrust evidence *de novo. Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477, 479 (7th Cir. 1980) (per curiam). Conclusions of law and mixed fact/law questions, of course, are subject to a broader scope of review. *United States v. General Motors Corp.,* 384 U.S. 127, 141–42 n. 16, 86 S.Ct. 1321, 1328–29 n. 16, 16 L.Ed.2d 415 (1966); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960).

The plaintiffs urge that the particular circumstances of this case require the application of a broader standard of review to the district court's findings of fact than that ordinarily granted under Rule 52(a). Where the evidence presented to a trial court is essentially documentary with few live witnesses, it is urged that appellate review may be broadened beyond the traditional application of Rule 52(a). Augmented review may arguably be appropriate in a "paper case" because a major rationale behind Rule 52(a)—the factfinder's opportuni-

ty to determine the credibility of witnesses—is not implicated.[8]

In the recent case of *City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976, 979 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981), this court acknowledged that "a broader rule" might be appropriate in a "paper case," but noted that even though "evidentiary documentation [was] voluminous, we see no need in these circumstances to go behind the findings of the trial judge" because nine live witnesses had testified at trial, and the trial judge had questioned the credibility of some of the witnesses. Similarly, we cannot agree with the plaintiffs that the case at bar was a "paper case." Eleven live witnesses testified at the trial. Judge Roszkowski's findings were influenced by some credibility determinations. The court, for example, rejected the testimony of the plaintiffs' expert regarding Vendo's dominance and market power in the industry.[9]

The plaintiffs also complain that many portions of the district court's opinion found their source in the defendant's post-trial brief or proposed findings of fact and conclusions of law. This circuit does not forbid a district court's partial or entire adoption of one party's findings of facts or conclusions of law. Rather, the use of this procedure is left to the discretion of the district court. *Scheller-Globe Corp. v. Milsco Manufacturing Co.*, 636 F.2d 177, 178 (7th Cir. 1980); *Norfolk & Western Railway Co. v. B.I. Holser & Co.*, 629 F.2d 486, 489 (7th Cir. 1980); *City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976,

979–80 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981); *Reese v. Elkhart Welding & Boiler Works, Inc.*, 447 F.2d 517, 520 (7th Cir. 1971). We realize that the adoption procedure is not flawless since such findings "do not reflect the original products of a disinterested mind." *Norfolk*, 629 F.2d at 489; *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1284 (7th Cir. 1977). Nonetheless this practice can be useful as an aid to the trial judge in complicated cases, *Scheller-Globe*, 636 F.2d at 178; *Reese*, 447 F.2d at 520, and "as a practical matter in these times a busy trial judge may in some circumstances be properly assisted with some of the paper work resulting from his own determination of the issues." *City of Mishawaka*, 616 F.2d at 980.

In this case, moreover, the adopted portions did not constitute the entire opinion. The district court rejected the defendant's affirmative defenses of collateral estoppel, *in pari delicto*, and statute of limitations. Furthermore, the district court's opinion spanned seventy-five pages, much of which did not represent the work of Vendo. While contending that the last thirty-five pages of the opinion were substantially adopted from Vendo's proposals, the plaintiffs conceded in oral argument that "there's a reasonable amount of Roszkowski in the first half of the opinion."

Having critically reviewed the record within the bounds of the clearly erroneous standard of review, *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 731 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), we conclude

---

**8.** The cases in this circuit, as in others, are not in total harmony on what standard of review is appropriate in a "paper case." Although some cases purport to abandon the clearly erroneous standard where the evidence is essentially documentary, *see, e. g., John R. Thompson Co. v. United States*, 477 F.2d 164, 167 (7th Cir. 1973); *Deep Welding, Inc. v. Sciaky Brothers, Inc.*, 417 F.2d 1227, 1229 (7th Cir. 1969), most of the cases which have discussed the issue have simply utilized a somewhat less exacting application of the clearly erroneous standard. *See, e.g., Oscar Gruss & Son v. First State Bank of Eldorado*, 582 F.2d 424, 431 (7th Cir. 1978);

*Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1284 (7th Cir. 1977); *Mercantile National Bank of Chicago v. Howmet Corp.*, 524 F.2d 1031, 1034 n. 3 (7th Cir. 1975).

**9.** The district court found, in part, that "Mr. Kamien did not know the market shares of other vending machine manufacturers and admitted having made no effort to determine them. . . . Not only are his opinions as to Vendo's dominance and monopoly power based on inadequate knowledge of the industry, but they are also based on theories that have no support in the antitrust laws."

that the district court's findings of fact relevant to the issues on appeal are not clearly erroneous. Moreover, as to those issues now properly before this court, we find that the district judge did not abuse his discretion in adopting the defendant's proposed findings and conclusions. In this case, as in *Scheller-Globe*, 636 F.2d at 178, "[w]e are satisfied that the district court did decide each of the issues and *thereafter* did adopt the findings and conclusions consistent with the determination that the court had made."

### The Relevance of the Prior Preliminary Injunction Hearing

The plaintiffs rely heavily upon Judge McLaren's 1975 determination that a preliminary injunction should issue because the plaintiffs were likely to succeed on the merits of their antitrust claims. Judge McLaren himself, however, realized that "[t]he findings contained herein are interlocutory in nature necessarily based on an incomplete record. Of course, a complete trial specifically directed to the issues in this case might produce evidence requiring a different or more limited result." 403 F.Supp. at 357 n. 5.

■ The decision granting the preliminary injunction resulted from a five day hearing at which eighty-nine exhibits and the testimony of four live witnesses were admitted. By contrast, Judge Roszkowski ruled on the merits after concluding a twenty-three day trial which included the testimony of eleven live witnesses and 2,762 exhibits. This contrast in the amount of

evidence considered by the district judge in each instance graphically demonstrates the reason underlying the rule that preliminary injunction determinations do not bind a court in the subsequent trial on the merits. This rule is so well-settled in this circuit, *Hunter v. Atchison, T. & S. F. Ry. Co.*, 188 F.2d 294, 298–99 (7th Cir.), *cert. denied*, 342 U.S. 819, 72 S.Ct. 36, 96 L.Ed. 619 (1951), and in the other circuits as to discourage most modern-day litigation of this issue. *See, e. g., Oburn v. Shapp*, 521 F.2d 142, 149 n. 18 (3d Cir. 1975); *Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 207 F.2d 190, 199 (9th Cir. 1953); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (3d Cir. 1953); *Benson Hotel Corp. v. Woods*, 168 F.2d 694, 697 (8th Cir. 1948). The purpose of a preliminary injunction is not to conclude the merits of the controversy, but merely to preserve the status quo until a more considered decision on the merits is possible.[10]

### The District Court Correctly Found No Violations of the Federal Antitrust Laws

#### I. THE SECTION 1 SHERMAN ACT CLAIM

■ It is by now an elementary principle of antitrust law that § 1, which literally prohibits "[e]very contract, . . . in restraint of trade or commerce among the several States, or with foreign nations . . ." does not in fact ban every contract in restraint of trade because "read literally, § 1 would outlaw the entire body of private contract law. Yet it is that body of law that estab-

**10.** In like manner, the plaintiffs seek to rely upon purported "findings" of the Supreme Court. They emphasize that "the Supreme Court, . . . while holding that an injunction could not legally issue, said that nothing in its opinion precluded the plaintiffs' *'ability to sue for treble damages resulting from the vexatious prosecution of that state court litigation.'"* (Emphasis in plaintiffs' brief.) The Supreme Court, however, was not addressing the merits of *this* case in that statement, nor did it make a finding that the state court litigation *in this case* was vexatious. Rather, the Court's statement was made in the context of its distinction between a federal court's power to enjoin future versus ongoing state proceedings. The Court noted that prior Supreme Court cases

recognized that repetitious sham state litigation could constitute an antitrust violation, and in that event, a federal court could enjoin such future state court litigation. But the court declined to read the Anti-Injunction Act so broadly as to allow a federal court to enjoin a pending state lawsuit suspected to be vexatious. The Court noted that "[a]ny 'disadvantage' to which the federal plaintiff is put in the initial proceeding is diminished by his ability to set up the federal antitrust claim as an affirmative defense, . . . and his ability to sue for treble damages resulting from the vexatious prosecution of that state-court litigation." 433 U.S. at 636 n. 6, 97 S.Ct. 2881, 2890 n. 6, 53 L.Ed.2d 1009.

lished the enforceability of commercial agreements and enables competitive markets—indeed, a competitive economy—to function effectively." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Unless the challenged activity conforms to one of the few categories of restraints adjudged to be *per se* illegal,[11] its legality is properly tested under the rule of reason analysis. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). In particular, the parties agree that the legality of noncompetition covenants ancillary to a legitimate transaction must be analyzed under the rule of reason. *National Society of Professional Engineers,* 435 U.S. at 688–89, 98 S.Ct. at 1363–64; *Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1082 (2d Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). The plaintiff shoulders the burden of proving the unreasonableness of a restraint unless the challenged activity is *per se* violative of the Act. *United States v. Empire Gas Corp.,* 537 F.2d 296, 308 (8th Cir. 1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

Legitimate reasons exist to uphold noncompetition covenants even though by nature they necessarily restrain trade to some degree. The recognized benefits of reasonably enforced noncompetition covenants are by now beyond question.[12] In the case at

bar, Robert Wagstaff's testimony underscores the recognized necessity for such a covenant: "We certainly felt that we didn't want to buy Stoner Manufacturing Company and then find out that he had set up shop someplace else and had the benefit of his name and equipment and whatnot."

■ The district court correctly concluded that covenants not to compete are valid if (1) ancillary to the main business purpose of a lawful contract, and (2) necessary to protect the covenantee's legitimate property interests, which require that the covenants be as limited as is reasonable to protect the covenantee's interests. *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 281–82 (6th Cir. 1898), *aff'd as modified,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

The plaintiffs contend that the covenants in this case were not ancillary to a legitimate business transaction, but were executed for the principal purpose of eliminating Stoner as a competitor. They cite Harry Stoner's lack of substantial duties to support their contention that "Vendo was thus paying Stoner not to compete rather than employing him for the performance of actual services." Viewed from another perspective, however, Stoner's paucity of responsibility may have simply reflected Stoner's personal need to avoid employment pressures. His premerger affidavit to the FTC, for example, underscores the severity

---

11. The *per se* analysis is, in reality, a truncated rule of reason analysis applicable to those restraints "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 555 (7th Cir. 1980) (A *per se* exception does not require an analysis of anticompetitive effects, not because "anticompetitive effects need not exist to establish the elements of a *per se* offense, but rather from the fact that the type of conduct complained of in a *per se* action is so destructive of free competition that deleterious effects will be conclusively presumed," such as with group boy-

cotts, market allocation, and certain types of tying arrangements.).

12. Even at common law,

[i]t must have been obvious ... that the flat ban against such restraints of trade covered more than the rationale of the [early common law *per se* rule against covenants not to compete] required. The rule might prevent desirable transfers of property. The most valuable asset of a business might be the good will of the public toward its owner. Should he wish to sell the business the owner could not get a price reflecting the asset of good will or the true going concern value of his business unless he could promise the purchaser not to return to compete with the business sold.

Bork, *Ancillary Restraints & the Sherman Act,* 15 ABA Section of Antitrust Law Proceedings, 211, 213 (1959) (footnote omitted).

of his health problems which motivated him to structure a flexible employment relationship. It may well be that Stoner did not minimize the condition of his health to the end of facilitating FTC clearance of a transaction apparently advantageous to him; nevertheless, the words were his and he must bear with all reasonable implications from them.

The district court rejected the plaintiffs' characterization of the main purpose of the covenants as "incredible," and found instead that the covenants were ancillary to contracts executed for lawful sale and acquisition purposes. The court emphasized that it was Stoner who (1) first initiated acquisition negotiations with Vendo, and (2) sought the ten as opposed to five year payout which resulted in the extension of the covenants not to compete from five to ten years.

Because Vendo did pay a substantial price to acquire Stoner Manufacturing, and was paying Stoner a considerable salary for whatever duties he did perform or would have been expected to perform had the parties' relationship not deteriorated so rapidly, Vendo's interests in protecting its (1) acquired goodwill, and (2) any trade secrets or clientele to which Stoner might potentially have access, see, e. g., Newburger, Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1082 (2d Cir. 1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978), were not insubstantial. This is *not* to say, as the plaintiffs suggest, that "the payment of money could somehow justify an anticompetitive covenant." Rather, under the circumstances of this case, the payment of money in the form of the acquisition price and salary is one factor tending to support the district court's finding that the noncompetition covenants were executed to protect Vendo's legitimate interests.

Even if we viewed the plaintiffs' evidence as presenting an arguable inference that the principal purpose behind the transaction was impermissible, we could not upset the district court's finding that the covenants not to compete were instead ancillary to a lawful main transaction in this case. Much of the plaintiffs' purported evidence of unlawful intent consists of isolated excerpts from the testimony of Vendo officers. In light of substantial contrary evidence, we cannot say that the district judge's findings were clearly erroneous.

The plaintiffs next argue that the covenants were facially overbroad as drafted and therefore totally void and unenforceable. The noncompetition covenant contained in the acquisition agreement essentially restricted Stoner Manufacturing from directly or indirectly competing with Vendo "in the United States or any foreign country in which Vendo or any affiliate or subsidiary is so engaged, in the manufacture and sale of vending machines or any business similar to that now being conducted by" Stoner Manufacturing for a period of ten years. The covenant not to compete ancillary to Stoner's employment contract prohibited Stoner from engaging, directly or indirectly, in the vending machine manufacturing business "in any of the territories in which... [Vendo] or its subsidiaries or affiliates is at present conducting business and also in territories which Stoner knows the Company or its subsidiaries or affiliates intends to extend and carry on business by expansion of present activities" for the duration of Stoner's employment with Vendo (which lasted five years) plus five years following the termination of employment.

■ While we would question the correctness of any finding of facial overbreadth,[13] we do not reach this issue be-

13. The plaintiffs primarily complain that the covenants were overbroad because they were tailored to protect the area in which Vendo, not Stoner Manufacturing, operated. We note that both parties operated throughout the United States, and Vendo, at least, operated in many foreign countries. In *Harrison v. Glucose Sugar Refining Co.*, 116 F. 304, 308 (7th Cir. 1902) (upholding the reasonableness of an employment contract prohibiting competition within 1,500 miles of the employer's place of business), this court tested geographical reasonableness in terms of "the area in which the *covenantee* [*i. e.* Vendo] prosecutes his business." (Emphasis added.) *See also United States v. Addyston Pipe & Steel Co.*, 85 F. 271,

cause we find support for the district court's position that (1) the actual phrasing of the covenants is irrelevant because a § 1 violation requires proof that the defendant knowingly enforced the arguably overbroad section of the ancillary noncompetition covenant, *see, e. g., Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1083 (2d Cir. 1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978), and (2) regardless of arguable overbreadth, most modern courts will uphold a covenant to the extent that a breach of the covenant has occurred within a reasonable geographic area and time period, and, where applicable, with respect to a product reasonably related to the legitimate purpose of the restraint. *See, e. g., Alders v. AFA Corp. of Florida*, 353 F.Supp. 654, 658 (S.D.Fla.1973), *aff'd without opinion*, 490 F.2d 990 (5th Cir. 1974); Blake, *Employee Agreements Not to Compete*, 73 Harv.L.Rev. 625, 674 (1960); Bork, *Ancillary Restraints and the Sherman Act*, 15 ABA Section of Antitrust Law Proceedings 211, 223–24 (1959).

Vendo sought to enforce the covenants in this case only as to clearly reasonable time, space, and product limitations. The district court correctly found that "Stoner's misconduct did not relate to some foreign land or some product far removed from Stoner's prior operations. On the contrary, the secret development of the Lektro-Vend machine took place right in Aurora, Illinois [the base of Stoner Manufacturing's prior operations and the division in which Stoner was subsequently employed to work for Vendo], and the Lektro-Vend machine was also a candy-vending machine." Moreover, the court emphasized that Stoner's aid in developing the Lektro-Vend machine occurred very shortly after the execution of the 1959 agreements. We agree with Judge Roszkowski that "based on the fact that Stoner became involved with Lektro-Vend within a year or two after selling Stoner Manufacturing, and considering the substantial financial commitment of Vendo in purchasing Stoner Manufacturing, it appears . . . that the restrictive covenants . . . were clearly necessary to protect Vendo's interests in the acquired business and employment of Stoner."

Even apart from alleged overbreadth, however, the district court ultimately ruled that because the plaintiffs did not establish the required § 1 showing of adverse impact upon competition in the relevant market, they failed to prove that the covenants were unreasonable under the rule of reason test. The appellants vigorously contend that no showing of adverse market impact is necessary to establish a § 1 violation in this case because "[i]n a covenant not to compete case, unlike a case involving a new form of vertical restriction, the pernicious, adverse effect on competition flows automatically from the foreclosure of competition by the restraint itself, and the only question is whether the restraint can be justified as necessary to protect a legitimate business purpose." In effect, although the plaintiffs concede that the rule of reason applies in this case, their contention that the adverse effect on competition flows automatically is tantamount to urg-

283 (6th Cir. 1898), *aff'd as modified*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899) ("More recently, the limitation that the restraint could not be general or unlimited as to space has been modified in some cases holding that if the protection necessary to the covenantee requires a covenant unrestricted as to space, it will be upheld as valid."). The plaintiffs' attempt to distinguish *Harrison* as an employment case is disingenuous since both employment and acquisition covenants are at issue here.

Moreover, the plaintiffs vigorously argue, in general, that the court should not look to subsequent events (*e. g.*, where and when the covenants were actually enforced) but should instead restrict its inquiry to the language of the covenants *as originally* drafted. They inconsistently argue, however, that Stoner was not subsequently entrusted with any confidential information or duties during his employment and, therefore, the employment covenant was invalid because it protected no valid employment interests. Because we have found that the acquisition transaction was motivated by a legitimate purpose, and that Stoner's employment was not a mere sham as the plaintiffs contend, we could not say that the parties originally drafted the covenant expecting that Stoner would not acquire any confidential information in his employment with Vendo.

ing a *per se* rule for analyzing noncompetition covenants under § 1. In *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963), this court ruled that under the generally more stringent standards of § 5 of the Federal Trade Commission Act, 15 U.S.C. 45(a), "even if this [non-competition] restriction is unreasonable as to geographic scope, we are not prepared to say that it is a *per se* violation of the antitrust laws."

██ It is by now well established that any rule of reason analysis requires a showing of anticompetitive market effect. To hold otherwise would ignore the very purpose of the antitrust laws which were enacted for the protection of competition, not competitors. Congress has consistently refused to create a private federal remedy for unfair competition. *Northwest Power Products v. Omark Industries*, 576 F.2d 83, 90 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Section 1 cannot supply private parties with a tool to redress ordinary business torts because § 1 forbids only those restraints damaging to competition. *Juneau Square Corp. v. First Wisconsin National Bank*, 624 F.2d 798, 810 (7th Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980); *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). In his frequently quoted formulation of the rule of reason test, articulated in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918), Justice Brandeis punctuated the Sherman Act's concern for competitive impact:

> The true test of legality is whether the restraint imposed is such as merely regu-

lates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine the question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

The requirement that plaintiffs prove adverse impact in the relevant market to establish a § 1 rule of reason violation is well established in the Seventh Circuit. *See, e. g., Contractor Utility Sales Co. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1078 (7th Cir. 1981); *Juneau Square Corp. v. First Wisconsin National Bank*, 624 F.2d 798, 810–11 (7th Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980); *Magnus Petroleum Co. v. Skelly Oil Co.*, 599 F.2d 196, 204 (7th Cir.), *cert. denied*, 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979); *Lee Klinger Volkswagen, Inc. v. Chrysler Corp.*, 583 F.2d 910, 914–15 n. 6 (7th Cir.), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 616, 58 L.Ed.2d 680 (1978); *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961).[14]

14. *Accord, Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 397 (2d Cir. 1980); *Cowley v. Braden Industries, Inc.*, 613 F.2d 751 (9th Cir.), *cert. denied*, 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980); *Kaplan v. Burroughs Corp.*, 611 F.2d 286 (9th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Daniels v. All Steel Equip., Inc.*, 590 F.2d 111, 113 (5th Cir. 1979); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 386–89 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *H & B Equip. Co. v. Int'l Harvester*

*Co.*, 577 F.2d 239, 246 (5th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 90 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 570–71 (5th Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 447–48 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978).

A showing of adverse market impact has been required in § 1 cases specifically involving noncompetition covenants. *See, e. g., Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1083 (2d Cir. 1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *United States v. Empire Gas Corp.*, 537 F.2d 296, 308 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). *Cf. Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963) (action under § 5 of the FTC Act, 15 U.S.C. § 45(a)).

In *Bradford v. New York Times Co.*, 501 F.2d 51, 59 (2d Cir. 1974), the Second Circuit noted that no court applying a rule of reason analysis has ever found an employment noncompetition covenant to violate § 1. Indeed, that circuit has questioned the propriety of applying a § 1 analysis to employment controversies of this type which it regards as individually exerting, at most, a very small impact on commerce, and which traditionally have been addressed by state courts. *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Bradford*, 501 F.2d at 60. The court in *Newburger*, however, acknowledged the contrary argument that encourages federal court involvement to curb widespread use of overbroad postemployment restrictions which allegedly cause serious anticompetitive injury to the national economy. *See* Goldschmid, *Antitrust's Neglected Stepchild: A Proposal for Dealing With Restrictive Covenants Under Federal Law*, 73 Colum.L.Rev. 1193, 1206–07 (1973).

While we would not refuse to analyze noncompetition covenants under § 1, the Sherman Act does require that the anticompetitive effect of an ancillary restraint be proven.[15] Because the Act is designed to combat adverse effects upon *competition*, however, the plaintiffs must prove more than mere injury to a competitor. *Juneau Square Corp. v. First Wisconsin National Bank*, 624 F.2d 798, 810–11 (7th Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 386 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d.494 (1979). Thus, the fact that the covenants in this case were imposed and enforced, thereby hindering the development of a Vendo competitor, Lektro-Vend, is not enough where the development of Lektro-Vend, was made possible only through substantial aid from Harry Stoner. Certainly, as the appellants point out, Stoner himself was eliminated as a competitor for a period of time, and the acquisition of Stoner Manufacturing prevented it from being acquired by a possibly more aggressive competitor of Vendo. But this argument proves too much. If this was sufficient evidence of anticompetitive effect, then virtually all noncompetitive covenants executed contemporaneously with a business acquisition or an employment contract would violate § 1 even if reasonably enforced.

We do not agree with the plaintiffs that "[i]f there were no evidence at all of adverse impact here, . . . an adverse impact could never be shown in a § 1 case, much less a covenant-not-to compete case." The facts of *this* case are not compelling, primarily because we agree with the district court that the main purpose of the transaction was legitimate, and the covenants were enforced reasonably with respect to time, geographic scope, and product. Therefore, we cannot find any impact upon competition beyond that which Vendo had a right to restrain in order to protect its legitimate interests.

## II. THE SECTION 2 SHERMAN ACT CLAIM

Section 2 of the Sherman Act proscribes attempted monopolization which has been described as "the employment of methods, means and practices which would,

---

**15.** The plaintiffs misconceive the nature of the burden of proving adverse market impact under § 1 when they allege that "Vendo [failed to] make even a feeble attempt to explain how competition was not impacted here." It is the plaintiffs' burden to prove the adverse effect on competition. *Cowley v. Braden Industries, Inc.*, 613 F.2d 751, 755 (9th Cir.), *cert. denied*, 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980).

if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it. . . ." *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946) (jury instruction approved by Supreme Court). The proof requires (1) a specific intent to monopolize, *i. e.*, to gain the power to control prices or to exclude competition in a line of commerce, *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir. 1980), (2) predatory or anticompetitive acts engaged in to further the purpose to monopolize, and (3) a dangerous probability of success in the relevant market [16] which requires evidence that the defendant had sufficient market power to have been reasonably able to create a monopoly, *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 297 (7th Cir. 1974); von Kalinowski, 2 *Antitrust Laws & Trade Regulation* § 9.01[2] at p. 9–7 (1979). *Chillicothe*, 615 F.2d at 430. We agree with the district court that the plaintiffs have failed to establish even one of the three required elements.

A. Dangerous Probability of Success

The district court first rejected the plaintiffs' contention that Vendo possessed sufficient market power to create a dangerous probability of achieving monopoly status. The court noted that while Vendo's sales and profits had increased overall between 1955 and 1966, sales had declined from 61 million to 52 million and profits had dropped from 3.1 million to 1.9 million between 1960 and 1963. These were the initial years of the "fabulous sixties"—a time of increasing industry growth and sales and also part of the time span during which Vendo was allegedly attempting to monopolize the market. Although Vendo's market share from 1959 to 1966 averaged approximately 30% of the relevant market, it dropped from 33% in 1966 to 24% in 1973. By 1974, its operator products market share shrank to 7.4% from a high of 22.5% in 1966.

After the acquisition of Stoner Manufacturing, Vendo held about 31% of the candy vending machine market, but by 1969, it maintained a share barely over 16%, and by 1972, Vendo had been wholly eliminated from the candy and cigarette vending machine markets. Between 1966 and 1977, Vendo's net income as a percentage of sales has averaged approximately .7%, down from 7% in 1966, Vendo's most prosperous year ever. Vendo's profits have steadily declined and in each of the four years preceding the trial, Vendo experienced substantial losses which have cumulatively amounted to almost ten million dollars.

Appellants argue that Vendo's post-1966 declining performance is totally irrelevant since the alleged attempt to monopolize occurred with the 1959 acquisition of Stoner Manufacturing and Vendo's initiation of the lawsuit to enforce Stoner's noncompetition covenants in 1965. The plaintiffs, however, cite no authority which would require exclusion of the evidence of the later period of time. To the contrary, in *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 836, 841 (2d Cir. 1980), although the alleged attempt was facilitated by certain actions occurring by or before 1969, the court relied upon a decline in the company's market share from 54.5% in 1969 to 33% in 1974 to reject the § 2 claim.

 It is true, as the appellants proclaim, that the Sherman Act's prohibition against attempted monopolization does not require that the attempt in fact ripen into an actual monopoly. It is the attempt which is the offense. *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). A subsequent failure to achieve monopoly status cannot itself vitiate a claim of attempted monopoly—where other evidence substantially supports the attempt—without eviscerating the entire attempt offense. But *Kearney* does not forbid consideration

---

**16.** Neither party disputes the district court's finding that the relevant market in this case consists of all coin-operated vending machines for the sale of food, beverages, and cigarettes in the United States.

of subsequent market performance to evaluate the existence of the alleged attempt as the plaintiffs contend. As Judge, now Justice, Stevens pointed out in *Kearney & Trecker*, evaluating dangerous probability

> requires an appraisal of the alleged offender's *ability to achieve the forbidden result*, his intent, and the nature of his overt actions. In an antitrust context we must consider *the firm's capacity to commit the offense*, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market.

*Id.* at 598 (footnotes omitted; emphasis added).[17] We agree with the district court that Vendo's market performance subsequent to the alleged attempts, while by no means dispositive, is at least relevant to Vendo's capacity to monopolize at the time of the supposed attempts.

The district court acknowledged the increased concentration within the relevant market, but found that no dangerous probability of monopolization existed based upon Vendo's 1959–66 30% market share, even apart from its dramatic post-1966 decline. The court noted that the plaintiffs failed to mention even one case in which an attempt to monopolize was based solely upon the market share attributed to Vendo. Nor have the plaintiffs directed our attention to any such case upon appeal. By contrast, numerous courts have found a market share of 30% or higher to be insufficient, by itself, to prove a dangerous probability of monopolization. *See, e. g., Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir. 1980) (54.5% to 33% range); *United States v. Empire Gas Corp.*, 537 F.2d 296, 305 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (50%); *Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649, 668 (S.D.N.Y.1980) (33%); *Allen Ready Mix*

*Concrete Co. v. John A. Denie's Sons Co.*, 1972 Trade Cases ¶ 73,955 (W.D.Tenn.1972) at 92,006–007 (30%); *Diamond International Corp. v. Walterhoefer*, 289 F.Supp. 550, 578 (D.Md.1968) (51%). *See Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 (8th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). Moreover, plaintiffs' own expert witness testified that market share alone is an insufficient indicator of a company's capacity to control prices and exclude competitors, and that other factors, such as ease of entry into the market, should be considered. Yet, as Judge Roszkowski found, the evidence presented relating to ease of entry contradicted the expert's opinion that Vendo possessed such power. Viewing the evidence of dangerous probability as a whole as we are bound to do, *United States v. Empire Gas Corp.*, 537 F.2d 296, 306–07 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977), we cannot say that the district court's finding on dangerous probability was clearly erroneous.

## B. Predatory Acts

The plaintiffs argue that Vendo's acquisition of Stoner Manufacturing and other companies, its covenants not to compete with Stoner and others, and its state court litigation to enforce noncompetition covenants in this and other cases, are examples of Vendo's predatory actions designed to seize monopoly power. It is true that acquisitions can sometimes provide evidence of predatory conduct, *see, e. g., United States v. Grinnell Corp.*, 384 U.S. 563, 576, 86 S.Ct. 1698, 1706, 16 L.Ed.2d 778 (1966), and "[a]greements not to compete have at times been used for that unlawful purpose." *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119, 68 S.Ct. 952, 947, 92 L.Ed. 1245 (1948). Such actions alone, however, are not generally considered predatory and are therefore rarely condemned

---

17. While the court in *Kearney & Trecker* commented that the defendant's 33% market share was "impressive," market share was not the only indicator of market *power* in that case. In *Kearney & Trecker*, the defendant's market power was enhanced by possession of a strategic patent with wide coverage nearly corresponding to the relevant market. *See* Handler & Steuer, *Attempts to Monopolize & No-Fault Monopolization*, 129 U. of Pa.L.Rev. 125, 164–65 (1980).

unless they occur within an overall context of unfair monopolistic practices as was true in the cases relied upon by the plaintiffs. *See, e. g., United States v. Crescent Amusement Co.,* 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944); *United States v. Lehigh Valley R.R. Co.,* 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253 (1920); *United States v. Union P.R. Co.,* 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124 (1912); *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); *United States v. Eastman Kodak Co.,* 226 F. 62 (W.D.N.Y.1915), *appeal dismissed,* 255 U.S. 578, 41 S.Ct. 321, 65 L.Ed. 795 (1921); *Bowl America, Inc. v. Fair Lanes, Inc.,* 299 F.Supp. 1080 (D.Md. 1969). Thus, the Court in *Schine Theatres,* 334 U.S. at 119, 68 S.Ct. at 952, noted that "[i]f we had here only agreements not to compete, the inferences drawn by the District Court might not be warranted. But in the setting of this record, and against the background of Schine's other monopolistic practices [conspiracy which, *inter alia,* effectively deprived competing theatres of first- and second-run movies, and threats to open theatres to prevent or destroy competition], . . . the District Court might infer that these agreements were additional weapons in Schine's arsenal . . . ." Similarly, Grinnell's acquisitions in *United States v. Grinnell,* along with discriminatory price manipulation and market allocation agreements, were considered predatory acts where actual monopoly power (87%) existed among the several affiliated defendants.

The district court found that Vendo's actions regarding the acquisition of Stoner Manufacturing and the execution and enforcement of the noncompetition covenants were motivated by legitimate business purposes, were not predatory, and were "nowhere near sufficient to create such a danger of monopoly . . . [in part] because of Vendo's declining market position, . . ." Judge Roszkowski further emphasized the plaintiffs' failure to prove that any of the actions charged were designed to or did cause injury to major competitors in the

vending machine industry such as National Vendors, Automatic Products, or RMI which have obtained significant market shares while Vendo's share declined. In fact, the plaintiffs conceded that Automatic Products was not affected by Vendo's actions.

In their brief on appeal, plaintiffs contest the court's finding that they presented no evidence of actual or potential effect upon competitors. They contend that sufficient impact upon competition was shown by Vendo's acquisitions of other companies, namely Vendorlator (that occurred three years prior to the start of the 1959–65 period which the plaintiffs insist to be the relevant time span), Continental APCO, and Coin Acceptors. We have reviewed the record and find that the circumstances surrounding these transactions provide insufficient proof of the existence of an overall plan to monopolize capable of transforming these otherwise legitimate business activities into predatory acts.[18]

## C. Specific Intent

Finally, we agree with the district court that the plaintiffs failed to establish the third prong of the attempted monopolization offense—specific intent. While specific intent to monopolize can sometimes be inferred from predatory acts, the plaintiffs failed to show that Vendo's actions relating to Stoner were not primarily motivated by legitimate business purposes. Nor did they present sufficient evidence to show that Vendo's other acquisitions, and the execution and enforcement of covenants not to compete in other contexts, were not predominantly motivated by legitimate business purposes, but were anticompetitive in intent or effect. Thus, specific intent cannot be inferred from these acts. *Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *Chisolm Brothers Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1145 (9th Cir.), *cert. denied,*

---

**18.** Similarly, proof of Vendo's alleged "policy" of executing and enforcing noncompetition covenants in other employment and acquisition contexts was insufficient to establish that these activities were predatory.

419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); von Kalinowski, 2 *Antitrust Laws & Trade Regulation* ¶ 9.01[4], at 9–26 (1979).

Appellants contend that specific intent may be inferred from the potentiality of monopoly power comprising a dangerous probability of monopolization, relying upon *Blair Foods, Inc. v. Ranchers Cotton Oil Co.*, 610 F.2d 665, 669 (9th Cir. 1980), and *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). We read these cases as supporting the proposition that market power may be "*one of the circumstances* to be considered in determining whether such intent exists." *Blair*, 610 F.2d at 670 (emphasis added). In the case at bar, however, market share sufficient to establish dangerous probability had not been proven.

Finally, appellants rely upon various statements made by Vendo officials [19] which are scattered throughout the voluminous record in this case. In the first place, we would not necessarily regard all of the appellants' examples as evidence of specific intent to monopolize. Secondly, while some of the references might arguably support a finding of specific intent if the evidence had established the existence of predatory acts or dangerous probability, we cannot say that the district court's finding of no specific intent was clearly erroneous in light of the plaintiffs' failure to establish these

other factors. We agree with the Fifth Circuit's affirmation in *Hayes v. Solomon*, 597 F.2d 958, 977 (5th Cir. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980) (defendant's threats to compete vigorously with, and drive out of business if necessary, a theatre the plaintiff proposed to build), that a "statement of intent to compete, . . . even if perceived as a threat, is not unlawful. Such a manifestation of intent to triumph in the competitive market, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation." (Footnote omitted.) *See Agrashell, Inc. v. Hammons Products Co.*, 479 F.2d 269, 285 (8th Cir.), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973) (Court attaches little significance to statement that the other party "had no right in the walnut shell business. This is my domain."); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971) (Court characterizes remark that the defendant would drive the plaintiff out of business if it chose to compete as "a manifestation of intent to triumph in the competitive market, [which] in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish a violation of § 2.").[20]

## III. THE STATE LITIGATION

The plaintiffs separately argue that Vendo's state court suit was not a

---

**19.** The following remarks are illustrative: "Vendo has had restrictive provisions for years in anything it can get them into...;" "I have always felt that one of the major advantages of the Stoner acquisition contract, from our standpoint, was the fact that it guaranteed that your [Harry Stoner's] design genius would never be coupled with our money to put a new and most formidable competitor into the business against Vendo;" and "Well, I am sure he [Stoner] thoroughly understood that he was not to compete with The Vendo Company.... [W]e just didn't want him to compete with us, . . . I mean he wasn't to compete anywhere, in the whole world, anywhere, he wasn't to compete."

The plaintiffs also rely upon the following colloquy:
Q: And from the standpoint of Vendo, then, the employment contract was just a means of getting a noncompetition covenant. That was its principal purpose, wasn't it?
A: One of the main justifications for it.

But the appellants delete the very next question which amplifies the above response:
Q: And it was used to put him on the shelf so to speak?
A: Well, I don't think that was ever part of the consideration.

**20.** This case is unlike *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 505 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), in which the court ruled that a jury could infer specific intent to monopolize from expressions of concern by IBM officials about growing competition and the use of "prima facie . . . anticompetitive activities that impaired competition without a legitimate business purpose." In the case at bar, the plaintiffs have failed to prove that Vendo's acts were predatory and not predominantly motivated by legitimate business purposes.

legitimate use of the adjudicative processes, and that it violated §§ 1 and 2. The main thrust of the argument is that Vendo sought to make the courts parties to enforce restraints forbidden by the Sherman Act. We agree with the plaintiffs that where state court litigation has resulted in the enforcement of contracts violative of the antitrust laws, a state court judgment cannot preclude a federal court from subsequently addressing the merits of the antitrust claims. This is precisely why the plaintiffs received a trial in federal court on their antitrust allegations. In the case at bar, however, no antitrust violation has been proved.

The plaintiffs have appealed the state court judgment to the Illinois Supreme Court which has rendered a final decision, *Vendo Co. v. Stoner*, 58 Ill.2d 289, 321 N.E.2d 1 (1974), *cert. denied*, 420 U.S. 975, 95 S.Ct. 1398, 43 L.Ed.2d 655 (1975). We, of course, are powerless to review the merits of that determination. U.S.Const. art. 4, § 1; 28 U.S.C. § 1738; *Davis v. Davis*, 305 U.S. 32, 40, 59 S.Ct. 3, 6, 83 L.Ed. 26 (1938).

## IV. THE SECTION 7 CLAYTON ACT CLAIM

▓▓▓ Even assuming *arguendo* that Vendo's 1959 acquisition of Stoner Manufacturing was a true horizontal merger,[21] the appellants have failed to establish a § 7 violation. Section 7 prohibits mergers if the effect on any line of commerce "may be substantially to lessen competition, or to tend to create a monopoly." While the statute's choice of the term "may" created a weapon to combat illegal restraints of trade in their incipiency, it also set the standard of proof at a reasonable probability, not mere possibility, of anticompetitive effect. *See, e. g., FTC v. Procter & Gamble Co.*, 386

U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967); *United States v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586, 598, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957). *See* S.Rep.No. 1777, 81st Cong., 2d Sess. 6 (1950).

The plaintiffs condemn the acquisition solely on the basis of market shares before and after the merger judged within the overall context of the vending machine market's trend towards concentration. In 1958, Vendo's share of the market consisting of food, beverage, and cigarette machines was 24.3%, while Stoner Manufacturing enjoyed a 4.4% share. After the acquisition in 1959, Vendo possessed a combined share of 35.6%. As the court below found, the vending machine industry was becoming increasingly concentrated. In 1957, there were 130 vending machine manufacturers, compared to 76 in 1963, and only 66 in 1964.

Based upon these statistics alone, the plaintiffs urge that the acquisition violated § 7. They rely upon the following cases in which similar or smaller combined market shares were condemned in an already concentrated industry, or an industry tending towards concentration: *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966) (7.5%); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (4.49%); *United States v. Continental Can Co.*, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964) (25%); *United States v. Aluminum Co. of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) (29.1%); *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (30%); *Seeburg Corp. v. FTC*, 425

---

21. Vendo contends that the companies were not actual competitors prior to the acquisition. The court never explicitly held that the acquisition was most properly analyzed as a horizontal merger because it found that the plaintiffs' § 7 claim failed even if the merger was truly horizontal.

If Stoner Manufacturing and Vendo were not true competitors, the acquisition would more properly be analyzed as a product extension merger to assess the anticompetitive effects of

Vendo's entry into the candy vending machine manufacturing market. The plaintiffs do not appeal the district court's rejection of their claim under the more stringent standards applicable to this type of merger as set forth in *United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) (geographic market extension). Instead, the plaintiffs merely insist that the merger "must be analyzed as a 'horizontal merger' between competitors."

F.2d 124 (6th Cir.), *cert. denied*, 400 U.S. 866, 91 S.Ct. 104, 27 L.Ed.2d 105 (1970) (18.9% of overall vending machine market and 25% of bottle vending machine submarket). These cases basically indicate that market share is a highly significant factor, and that mergers between strong and viable competitors are likely to be prohibited in an increasingly concentrated market even where the combined market share is very low. *See* von Kalinowski, 3 *Antitrust Laws & Trade Regulation* § 19.02[1], at 19–49 (1979).

In *United States v. General Dynamics Corp.*, 415 U.S. 486, 497, 94 S.Ct. 1186, 1193, 39 L.Ed.2d 530 (1974), the Supreme Court adverted to its earlier decision in *Philadelphia National Bank*, 374 U.S. at 363, 83 S.Ct. at 1741, wherein the Court stated that a merger resulting in a firm with an undue market share which increases the concentration of firms in the market "is so inherently likely to lessen competition substantially that it must be enjoined *in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.*" (Emphasis added.) Thus, a preliminary statistical showing of even small increases in market share or market concentration will generally suffice to establish a prima facie § 7 violation in an industry where concentration is substantially increasing because "[i]n most situations . . . the unstated assumption is that a company that has maintained a certain share of the market in the recent past will be in a position to do so in the immediate future." *General Dynamics*, 415 U.S. at 501, 94 S.Ct. at 1195. This general presumption, however, does not allow a court to ignore other evidence tending to show that the market shares do not accurately reflect the likelihood that the merger will substantially affect competition adversely. *General Dynamics* admonished that:

> In *Brown Shoe Co. v. United States* . . . we cautioned that statistics concerning market share and concentration, while of great significance, were not conclusive indicators of anticompetitive effects:

> "Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry." 370 U.S. [294] at 321–322 [82 S.Ct. 1502 at 1521–22, 8 L.Ed.2d 510]

> "Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Id.*, at 322 n. 38 [82 S.Ct. at 1522 n. 38]

415 U.S. at 498, 94 S.Ct. at 1194.

In *General Dynamics*, the Court found no § 7 violation in part because the acquired company's coal reserves were so low that its potential effectively to compete in the future was weaker than the Government's market share statistics suggested. The Court rejected the Government's contention that the trial court's finding in this respect was equivalent to accepting a "failing company" defense without satisfying the Supreme Court's strict requirements for showing (1) that the acquired business faced a grave possibility of business failure, and (2) that the company had tried, but failed, to merge with a company other than the acquiring firm. 415 U.S. at 506–07, 94 S.Ct. 1199. The Court ruled that the defendant's presentation of evidence relating to the acquired company's weakened market position did not relate to the "failing company" defense, but instead "went to the heart of the Government's statistical prima facie case. . . ." *Id.* at 508, 94 S.Ct. at 1199. *See United States v. Citizens & Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975) (Assuming that the government had established a prima facie violation of § 7, "[i]t was incumbent upon [the defendant] to show that the market-share statistics gave an inaccurate account of the acquisitions' probable effects on competition"). Similarly, in *United States v. International Harvester Co.*, 564 F.2d 769, 774 (7th Cir. 1977), this circuit

applied the *General Dynamics* rationale and found the statistical proof rebutted by evidence which included a demonstration of the acquired company's weakened financial condition prior to the merger.

In the case at bar, despite the plaintiffs' reliance on a few statements by Vendo officers to the effect that Stoner Manufacturing was still viable prior to 1959 and was not about to collapse, the undisputed evidence shows that Stoner Manufacturing's market position in the late fifties was anything but healthy. Its share of the national candy vending machine market had slid precipitously from 71% in 1955 to only 31% by the time of the acquisition four years later. Harry Stoner's premerger affidavit to the FTC illustrated that he himself believed that Stoner Manufacturing's decline would continue if not sold: "I do not want to let the business just drift and carry on of its own momentum, because this cannot continue indefinitely and there is great risk of loss involved in such a program. I attribute our poor showing in sales for 1958, and since, at least in part to the management difficulties I have already described [*i. e.* Stoner's failing health and the death of a key executive who could not be effectively replaced]."

The district court not only relied upon Stoner Manufacturing's deteriorating market position prior to the acquisition, but also noted that Vendo's competitive position had declined significantly after the merger. Post-acquisition evidence is admissible since the probability of anticompetitive effects is judged at the time of trial. *United States v. General Dynamics*, 415 U.S. 486, 505, 94 S.Ct. 1186, 1197, 39 L.Ed.2d 530 (1974). The Court in *General Dynamics* pointed out that the admissibility of post-acquisition evidence generally disfavors defendants because a demonstration of no anticompetitive effects between the time of acquisition and the time of trial is usually accorded limited weight, whereas proof of post-acquisition anticompetitive effect cements the plaintiff's case. This disparity in treatment follows partially from the fact that merged firms could simply refrain from aggressive or anticompetitive behavior until after the

lawsuit was concluded. *Id.* at 504–05, 94 S.Ct. at 1197. But post-acquisition evidence favorable to a defendant can be an important indicator of the probability of anticompetitive effects where the evidence is such that it could not reflect deliberate manipulation by the merged companies temporarily to avoid anticompetitive activity, and could not reasonably be construed as representing less active market competition than would otherwise have occurred without the questioned acquisition. *General Dynamics*, 415 U.S. at 506, 94 S.Ct. at 1198 (changing structure of the industry). *See United States v. International Harvester Co.*, 564 F.2d 769, 777–79 (7th Cir. 1977) (evidence of intensified industrial competition). *Cf. Varney v. Coleman Co.*, 385 F.Supp. 1337, 1345–46 (D.N.H.1974) (where post-acquisition evidence in a product extension merger showed that the defendant had lost both money and market share, the § 7 claim could not withstand a summary judgment motion); *United States v. Falstaff Brewing Corp.*, 383 F.Supp. 1020, 1027 (D.R.I.1974) (no § 7 violation where post-acquisition evidence showed that competition remained intense and that the acquired company's profits and market share declined after the geographic extension merger).

The post-acquisition evidence in this case is the type which cannot arguably have been subject to the defendant's deliberate manipulation, nor is it likely that the market was less competitive after the acquisition than it would have been otherwise. Between 1959 and 1969, Vendo's share of the candy vending machine manufacturing market dropped from 31% to 16%, and by 1972, Vendo was completely eliminated from the candy and cigarette vending machine business. As discussed previously, while Vendo's overall market share averaged approximately 30% between 1959 and 1966, it plummeted to 24% in 1973.

Consequently, based upon evidence establishing that (1) Stoner Manufacturing's market position had been steadily deteriorating in the years immediately preceding the acquisition, and (2) Vendo's post-acquisition shares and profits dramatically de-

clined even as the performance of some of its competitors improved,[22] the district court clearly did not err in rejecting the plaintiffs' section 7 claim.[23]

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**22.** This result is fortified by our recent decision in *Kaiser Aluminum & Chemical Corp. v. FTC,* 652 F.2d 1324 (7th Cir. 1981), wherein this court ruled that while unrebutted statistical evidence can alone establish a § 7 violation under *General Dynamics,* nonstatistical evidence undermining the probative value of the statistics can rebut the prima facie case. At 1341. While the court specifically rejected the argument that financial weakness of the acquired firm can *alone* justify a merger, it did recognize that "the financial weakness of the acquired firm ... may be a relevant factor in some cases." *Id.*

**23.** Because of the disposition of this claim in favor of the defendant, we need not address other alternative arguments advanced by Vendo.