**VERSON WILKINS LIMITED and Verson [U.K.] Limited, formerly Verson International Limited, Plaintiffs,**

v.

**ALLIED PRODUCTS CORPORATION, Defendant.**

No. 87 C 5325.

United States District Court, N.D. Illinois, E.D.

Sept. 21, 1989.

Thomas W. Johnston, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs.

Joe A. Sutherland, Gordon B. Nash, Jr., W. David Braun, and Michael P. Padden, Lolla Harrison, Gardner, Carton, & Douglas, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

We have before us the summary judgment motions of plaintiffs Verson Wilkins Limited and Verson [U.K.] (collectively "VIL") applicable to count V of the verified third amended complaint[1] and the amended counterclaim submitted by defendant Allied Products Corporation ("Allied").[2] Resolution of these motions centers on the legality of various contractual arrangements under both the common law (as unreasonable restraints of trade) and also under the antitrust laws of the United States and the State of Illinois. VIL contends summary judgment is appropriate because the context in which the contracts at issue were negotiated—both as incidental to a business sale and also as ancillary to know-how license agreements—legitimizes their restrictive nature.

## FACTS

Verson Allsteel Press Company ("VASP") presently operates as a division of defendant Allied. VASP sells products both under its own name and also that of F.J. Littell Machine Co. ("Littell"). Littell was formerly a direct subsidiary of VASP and now operates as a division of Allied. Littell builds coil-handling and coil-processing equipment including press automation coil feeds, scroll sheeting and other cut-to-length lines.

In the mid–1970s VASP began experiencing erratic swings in profitability. It made a belated entry into the international market in 1968–69 by acquiring Verson Europa and entering into an exclusive license and cross-distribution agreement with Hindustran Machine Tool Company of India. In 1979 VASP separated out its international operations by incorporating Verson International Ltd. ("VILTD") in Delaware.[3] These two corporate entities executed an Assignment and Transfer Agreement dated September 9, 1980. In consideration of VILTD's entire capital structure, VASP

---

1. Count V is entitled, "Allied's Infringement of VIL's Exclusive Territory" (verified third am. cplt. at 25).

2. In its amended counterclaim, Allied contends the market dividing agreements are unreasonable, unenforceable restraints of trade and requests a declaratory judgment so stating.

3. Allied attempts to distinguish the rights of what it calls Verson Delaware (incorporated in 1979 by VASP in Delaware as Verson International Ltd.) and VIL (established in 1979 by VASP in England). This contention merely further clouds an already complicated corporate history, and does so seemingly without justification. Allied contends Mr. Kelleher fails to explain "how the allegedly enlarged rights of VIL

Delaware were transferred to VIL or why VIL, VASP and VIL Delaware would abandon their consistent pattern of documenting the transfer of rights to technology" (Allied Products Corp.'s reply mem. on the mo. for sum. jdgmt. at 3). We frankly cannot isolate exactly how this contention impacts on the motions at issue, nor can we understand why, if we are correctly interpreting the claim, Allied chose to wait until now to lodge its objection. We choose to ignore this issue at the present time, and instruct Allied to reevaluate its position in light of this opinion. Were VIL's corporate structure to remain relevant, Allied is hereby granted permission to submit its argument on paper.

agreed therein to transfer ownership of all its technology, including patents and know-how relating to the manufacture of presses and auxiliary equipment to VILTD for all countries of the world save the United States and Canada. VASP also contracted to pay VILTD a 5% commission on foreign sales of VASP products. The latter thus effectively became a holding company for VASP's international operations.

Together, VILTD and the subsidiaries it thereafter created to license, contract, distribute and manufacture VASP equipment overseas became known as Verson International ("VIL"). T.S. Kelleher was appointed managing director of each VIL company, including VILTD. Allied denies VIL's claim that it, VIL, thereafter acted as VASP/Littell's exclusive agent and distributor outside the United States and Canada.

After VASP acquired Littell on December 1, 1980, VIL saw opportunities for the manufacture and marketing of Littell products overseas. Its efforts in this regard included submissions to the Belgian government in an attempt to begin European production. In 1982 and 1983 VIL obtained two orders for a Littell decoiler from Ford U.K. Production of those orders took place at Verson Europa's plant in Belgium using Littell know-how. According to VIL, this effort was a financial failure because of equipment inefficiencies and a lack of engineering expertise. VIL also contends a decision was then made to halt further efforts to manufacture Littell products until investment in the necessary plant, equipment and manpower was possible.

In 1983–84, after it had acquired the outstanding capital stock of F.J. Littell, VASP's financial condition worsened. These problems reached an apex in mid–1984 when the Continental Illinois Bank, VASP's principal banker, went through its own financial crises and was unwilling to lend additional funds to VASP.

In the summer of 1984 VASP, and a group comprised of its international managers, agreed to a buyout of VIL ("management buyout" or "MBO"). The purchase price of $2,859,000 was derived from the firm's book value and represented approximately $1.5 million over the liquidation value. The MBO was approved in principal by the VASP board of directors at their September 10, 1984 meeting and formally approved on December 10, 1984. The deal was closed on March 8, 1985.

The MBO consisted of 23 separate contracts, the most important of which for these purposes are arrangements specifying restrictions controlling the operations of the resulting entities—the management-owned VIL and the now smaller VASP. Four contracts are particularly relevant: the VASP/VIL License Agreement, the VASP/VIL Marketing Agreement, the VIL/VASP License Agreement, and the VIL/VASP Marketing Agreement. Those contracts, *inter alia*, ensured that the management-owned VIL retained the former VIL's rights respecting VASP's patents and know-how. The VASP/VIL Marketing Agreement provides:

3.01

On the tenth day of each month during the term of this License Agreement, except after notice of termination is given, Verson shall provide Licensee with such know-how and other technical data, drawings and information as has been developed, utilized, produced or completed during the previous month as will enable Licensee, using competent personnel, to prepare appropriate technical quotations and to calculate the prices for the sale of Equipment, and as will enable Licensee, using competent personnel, equipment, processes and material, to Manufacture Equipment. The documentation to be delivered under this Section 3.01 shall include but not be limited to the following: Profit planners of equipment sold by Verson, cost estimates and quotations for Equipment quoted by Verson, and for which Licensee is asked to quote to Verson, Production and change orders, complete engineering drawings and calculations and modifications if applicable, complete manufacturing drawings and modifications if applicable....

The reciprocal contract, the VIL/VASP Marketing Agreement, guarantees VASP similar access to VIL technology, predomi-

nantly improvements in VASP know-how. Both License Agreements define terms such as "Equipment," "Know–How" and "Improvements" in Article One at 1.0., 1.03 and 1.05, respectively.

The geographic divisions gave each company a right of first refusal: VIL was permitted to do business in the United States and Canada (VASP's exclusive territory) and VASP was permitted to operate outside that region (VIL's exclusive territory), but only after the other party was given the option to manufacture and sell. Section 3.01 of the VASP/VIL Licensing Agreement gives VIL "the exclusive right and license to Manufacture, use and sell the Equipment in the Territory which is covered by the Patents and/or by utilizing the Know–How." And the comparable Section of the VIL/VASP Licensing Agreement provides VASP with the same. Only the definition of "Territory" changes: in the VASP/VIL Marketing and Licensing Agreements as "all nations, countries and states of the world, except the United States of America and Canada," §§ 1.02 and 1.07, respectively, and in the VIL/VASP agreements as "[t]he United States and Canada." §§ 1.02 (Marketing Agreement) and 1.07 (Licensing Agreement). Put another way, outside the United States and Canada, VIL may either procure orders for its own account by fabricating the equipment in its own facilities, or it may refer the business to VASP. Under the second alternative, VIL acts as VASP's agent and receives a commission if VASP secures the order.[4]

In July 1985 Melvin Verson, then VASP's chairman and chief executive officer, referred an order from the A.G. Simpson Company of Scarbrough, Canada ("Simpson"), to VIL. Acting as VIL's agent, VASP subsequently negotiated an agreement in VIL's name to produce three 1600–ton presses. The contract was executed on August 13, 1985. Nine months later, in April 1986, VIL again secured an order from the same firm, this time for six 900–ton presses. Both sides dispute the degree to which VASP assisted in this purchase.

When Simpson expressed a desire to purchase an additional five 900–ton machines, VASP invoked its rights under the contracts signed pursuant to the MBO. The president of VASP, a Mr. German, asserted his company's exclusive rights to orders supplied within the United States and argued that VASP should therefore be permitted to fill the Simpson order. Simpson's purchase was effected through VASP for approximately $3,485,000.

In the period since the MBO, VIL has conducted significant operations outside the United States and Canada. It has expended considerable sums—including the cost of maintaining sales offices and employing third party agents worldwide—to further the sales and licensing of VIL/VASP/Littell products, including scroll sheeting lines.

In May 1986 Allied acquired all the assets of VASP, and thereby Littell. Pursuant to the Asset Acquisition Agreement, Allied expressly assumed all the obligations and liabilities of the acquired firms.

Allied has submitted a listing of prospective scroll sheeting line business in VIL's territory, consisting of 21 orders in 14 countries. VIL, in turn, has compiled a list of its quotes in those countries in the period 1980–1985.

| Country | No. of Quotes | Value of Quotes (000) |
|---|---|---|
| Argentina | 20 | 7,094 |
| Belgium | 52 | 12,599 |
| Brazil | 48 | 25,004 |
| Indonesia | 36 | 25,541 |
| Italy | 36 | 39,279 |
| Korea | 32 | 33,265 |
| Malaysia | 12 | 1,361 |
| Netherlands | 32 | 20,530 |
| Poland | 38 | 19,482 |
| Singapore | 28 | 18,829 |
| Spain | 26 | 15,931 |
| Taiwan | 43 | 39,926 |
| Thailand | 8 | 1,958 |
| United Kingdom | 755 | 297,307 |

4. VASP to VIL Marketing Agreement § 3.05. Where VASP acts as VIL's agent it too receives a commission. VIL to VASP Marketing Agreement § 3.05.

(Henderson aff. § 17, app. tab A.) The parties disagree with respect to the likelihood that these projections will actually result in orders. VIL contends it can only fill requests for between 4 and 8 scroll sheeting lines prior to the current expiration of the MBO agreements, thereby leaving no less than 13 for Allied/Littell outside the United States and Canada.

## PROCEDURAL HISTORY

Certain disputes developed with respect to the restrictions adopted incident to the MBO, though the parties disagree as to exactly what precipitated this lawsuit. Be that as it may, VIL filed suit on June 15, 1987, alleging, *inter alia*, Allied's failure to adhere to its contractual obligations under the agreements negotiated incident to the MBO. A preliminary injunction hearing was held over several days in July 1987, in which VIL sought the immediate transfer of various know-how pertaining to the transmat press technology at issue in count I.[5] Allied claimed the agreements violated both The Treaty of Rome—which governs corporate affairs within the European Economic Community ("EEC")—and also the antitrust laws of the United States. This court's order of July 16, 1987, granted the preliminary injunction and required Allied to transfer the transmat press technology to VIL.

Allied took its Treaty of Rome concerns directly to the Commission of the European Communities (the "Commission"), the body which enforces the rules and regulations of the EEC. In April 1987 Allied "notified" the Agreements to the Commission and on October 19, 1987 submitted a complaint and application pursuant to Article 3(2) of Council Regulation No. 17/62, alleging that the Agreements violated Article 85(1) of the Treaty of Rome.[6] VIL contended the restrictions at issue were not only consistent with 85(1) but also fell within the EEC's antitrust exemption under Article 85(3). Pursuant to Article 6 of Commission Regulation No. 99/63 a letter was issued on November 24, 1988 (the EEC letter),

describing why there were insufficient grounds for granting the application. Allied was given six additional weeks, or until approximately January 10, 1989, to submit "any further comments."

While the case was pending before the Commission we considered another preliminary injunction motion. Throughout March the parties submitted materials pertaining to Allied's purportedly illegal refusal to transfer Littell's scroll sheeting technology to VIL. A hearing was held at the end of the month and, after receiving post-hearing memoranda, this court granted the preliminary injunction on August 12, 1988 and ordered the technology there at issue transferred.

We now consider the territorial restrictions adopted at the time of the MBO. VIL contends Allied/Littell has marketed its scroll sheeting lines to overseas customers in VIL's exclusive territory and it therefore seeks over $3.4 million in damages pursuant to count V alone. Allied submits that those provisions are unenforceable as a matter of law. We agree in part and disagree in part.

## DISCUSSION

### I. Legal Standards

#### A. *Federal Antitrust Legislation*

By its terms, Section 1 of the Sherman Act literally prohibits "[e]very contract ... in restraint of trade or commerce among the several States, or with foreign nations...." But elementary principles of antitrust law make clear that § 1 outlaws only certain contractual arrangements. "[R]ead literally, § 1 would outlaw the entire body of private contract law. Yet it is that body of law that established the enforceability of commercial agreements and enables competitive markets—indeed, a competitive economy—to function effectively." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Section 1 consequently is under-

---

5. Count I is entitled, "Refusal to deliver large transmat know-how."

6. Case No. IV/B–2/32.315—Allied Products Corp./Verson International Group Ltd.

stood to prohibit only unreasonable restraints of trade. *See Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

■ Scrutiny under the antitrust laws takes two separate paths. First, certain activity is so predominantly anticompetitive to be considered *per se* illegal. When "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output," courts invoke the *per se* rule. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). In such circumstances, any pro-competitive rationale that may arguably justify the restraint is not evaluated. Because the court does not look at the totality of circumstances surrounding the restraint, the *per se* analysis, which bypasses the comprehensive scrutiny contemplated by the rule of reason, can therefore be viewed as a "truncated rule of reason analysis applicable to those restraints 'which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Lektro–Vend Corporation v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (quoting *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)).

■ Treatment under the *per se* standard, however, is more the exception than the rule. Unless the challenged activity falls within one of relatively few categories, such as horizontal price-fixing, the conduct at issue is scrutinized under the rule of reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Put succinctly, the trier of fact determines "whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."

*Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982). Justice Brandeis' seminal pronouncement summarizes the inquiry:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Board of Trade*, 246 U.S. at 238, 38 S.Ct. at 244.

■ Non-competition agreements do not fall within the category of restraints for which evaluation under the *per se* rule would be appropriate. Quite simply, "[l]egitimate reasons exist to uphold noncompetition covenants even though by nature they necessarily restrain trade to some degree. The recognized benefits of reasonably enforced noncompetition covenants are by now beyond question." *Lektro–Vend*, 660 F.2d 265. Such agreements often encourage what Judge Bork has called "desirable transfers of property":

> The most valuable asset of a business might be the good will of the public toward its owner. Should he wish to sell the business the owner could not get a price reflecting the asset of good will or the true going concern value of his business unless he could promise the purchaser not to return to compete with the business sold.

Bork, Ancillary Restraints & the Sherman Act, 15 ABA Section of Antitrust Law Pro-

ceedings, 211, 213 (1959), *quoted in Lektro–Vend*, 660 F.2d at 265 n. 12.

Recognizing the legitimacy of some covenants not to compete, however, does not mean that all must be tolerated. A court must first determine that the legitimate reasons behind the restraint as to survive the rule of reason. The Seventh Circuit has outlined our inquiry:

> [C]ovenants not to compete are valid if (1) ancillary to the main business purpose of a lawful contract, and (2) necessary to protect the covenantee's legitimate property interests, which require that the covenants be as limited as is reasonable to protect the covenantee's interests.

*Lektro–Vend*, 660 F.2d at 265, (invoking *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281–82 (6th Cir.), *aff'd as modified*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899)).

### B. *Illinois Antitrust Legislation/Common Law* [7]

Illinois courts have reviewed non-competition restrictions under criteria similar to the second prong of the *Lektro–Vend* test, but somewhat more expansive, requiring that the covenants at issue must be as limited as is reasonable to protect the covenantee's interests:

> It is an accepted principle that the enforceability of a restrictive covenant "in restraint of competition is conditioned upon its reasonableness in terms of its effect upon the parties to the contract and the public."

*Boyar–Schultz Corp. v. Tomasek*, 94 Ill.App.3d 320, 322–23, 418 N.E.2d 911, 913, 49 Ill.Dec. 891, 893 (1st Dist.1981) (quoting *House of Vision, Inc. v. Hiyane*, 37 Ill.2d 32, 37, 225 N.E.2d 21, 24 (1967)). They have enunciated a three-part test of "rea-sonableness": the restraint must be (1) necessary in its full extent for the protection of the buyer; (2) simultaneously not oppressive to the seller; and (3) not injurious to the public interest. *See, e.g., Boyar–Schultz*, 94 Ill.App.3d at 323, 418 N.E.2d at 913, 49 Ill.Dec. at 893 (citations omitted); *see also O'Sullivan v. Conrad*, 44 Ill.App.3d 752, 756, 358 N.E.2d 926, 3 Ill.Dec. 383 (1976); *McCook Window Co. v. Hardwood Door Corp.*, 52 Ill.App.2d 278, 287, 202 N.E.2d 36, 41 (1st Dist.1964). We decide these state law questions now, before trial, because the determination of "[w]hether the contract under consideration is reasonable or contrary to public policy is a question of law." *Barrington Trucking Co. v. Casey*, 117 Ill.App.2d 151, 156, 253 N.E.2d 36, 38, *leave to appeal denied*, 42 Ill.2d 586 (1969).

While the federal and state standards differ in some respects, they both look to the reasonable protection of legitimate business interests and we therefore discuss them together. VIL contends that the restrictions on VASP are ancillary both to covenant sufficiently outweigh the anticompetitive features of a legitimate business sale and to a license of know-how. We consider each of those contentions separately, and those contentions also require us to consider the restrictions on VIL.

## II. The Sale of Business Rationale

### A. *Ancillary to a Legitimate Business Purpose*

There is no dispute that the sale of a business is lawful and that various cases have recognized that restraints on competition can be both ancillary to such a sale and reasonable in the circumstances.

Allied claims that particular aspects of the MBO render the sale-of-business line of

---

7. In its fourth affirmative defense Allied argues that "[p]laintiffs' claims arise out of alleged agreements that are illegal under the antitrust laws and Illinois common law" (def. Allied Prod. Corp.'s verified ans. to third am.cplt., aff. defense and counterclaim at 46). That being the fourth defense in its entirety, we are left to wonder exactly which legislative enactment the agreements purportedly violate. We also cannot help but note that none of the cases cited to us contain discussion of any Illinois legislation. They instead recite the common law principle that contracts in restraint of trade are disfavored, and subsequently evaluate whether the particular restraint at issue falls within one of the various exceptions to the rule. Taking our cue from the parties' own submissions, our discussion focuses on resolving the common law issues. While this order may well provide a sufficient legal basis for resolving the dispute under the relevant state antitrust legislation, we leave that decision to another day.

cases inapplicable. (*See* Allied Product Corporation's 12(e) statement and memorandum in support of its motion for summary judgment at 8). First, it contends both that the whole business was not sold and also that the seller remained in the same market. We interpret these contentions as suggesting that because VASP continued to operate domestically after the MBO, the separation of its international operations did not qualify as a sale of business within the meaning of the prior case law. That conclusion cannot be correct, for the *raison d'etre* of the territorial restrictions that have previously been upheld by other courts as incident to business sales was to protect the sold operation from competition by the seller. Taken to the extreme, Allied's argument suggests that territorial restrictions are always illegal. We cannot possibly countenance that result and thereby reject these two alleged distinctions.

Allied also contends that "rather than simply agreeing not to compete, the parties here each agreed to become the other's exclusive sales agent in their exclusive territory" (Allied's 12(e) stmt. and mem. in sup. of mo. for sum.jdgmt at 8). As compared to the structures previously declared permissible, rights of first refusal seem to affect competition in the very same way. If anything, the law permits contractual restraints even more restrictive than those at bar: agreements in appropriate circumstances can be structured to prohibit the opposing party from ever entering the exclusive territory. Since the law would legitimize this alternative arrangement were it ancillary to a business sale, rights of first refusal, being less restrictive, should be similarly treated.

Allied further contends that because the price of the MBO merely reflected the firm's book value, it did not have a good will component, and therefore the sale-of-business line of cases is inapplicable. The absence of a good will transfer presumably renders inapplicable the rationale submitted by Judge Bork and others for permitting territorial restrictions incident to a business sale.

However the parties derived the purchase price, we cannot assume no good will was transferred. That the relevant financial documents do not reflect the transfer of good will is not particularly probative. The accounting procedures from which the book value is derived are far too discretionary to assume significant legal importance. At a minimum, the law does not require proof via financial documents. And more generally, there are innumerable business reasons, including tax considerations, which might explain why a particular entry reflecting the transfer of good will was not included. We look instead to the totality of the circumstances and conclude that such a transfer was an essential component of the transaction.

Judge Bork's use of the term is shorthand for a customer base and/or reputation in the market. That interpretation was recognized early on. For example, Justice Walter noted:

> The term "good will" is generally used as indicating that element of value which inheres in the fixed and favorable consideration of customers arising from an established and well-known and well-conducted business....

*Randall v. Bailey*, 23 N.Y.S.2d 173 (N.Y. Sup.Ct.1940), *quoted in* Brudney and Chirelstein, *Corporate Finance* 343 (1987). To the extent that the MBO transferred ownership and control of a going concern, the good will previously created by VASP, the seller, inevitably flows to the purchaser.

Allied's last distinction, the reciprocal restraints, presents a more difficult problem. The vast majority of prior cases did not evaluate agreements in which there was a reciprocal covenant on the part of the buyer not to compete with the seller. Because this second covenant protects the seller by restricting the buyer, it is irrelevant to protecting the good will of the business sold. That distinction very clearly impacts our decision.

The court in *Shute v. Shute*, 176 N.C. 462, 97 S.E. 392 (1918) faced a remarkably similar, albeit dated, fact pattern, and relied upon that distinction in refusing to

enforce certain market division agreements. The contact there specified that J.R. Shute ("J.R.") would sell to his brother J.T. Shute ("J.T.") a cotton gin plant in Monroe, North Carolina, for $4,000. The same agreement provided that J.T. would have "the exclusive privilege of buying and selling seed cotton and cotton seed so far as the said J.R. Shute is concerned, on the south side of Bear Skin Creek for a period of ten years from September 1, 1916." 176 N.C. at 462, 97 S.E. at 392. J.R. agreed:

> Neither to build nor cause to be built any ginning plant in Union county on the south side of Bear Skin creek for a period of ten years after September 1, 1916, and not to be operated, or cause to be operated, or be interested in any way with any person, firm, or corporation, in operating any ginning plant in Union county on south side of Bear Skin creek for said period of ten years.

*Id.* That side of the transaction neatly corresponds to VASP's agreement to stay clear of VIL's exclusive territory for the five years following the MBO. Most relevant for these purposes, the court described

> a further provision that the defendant, J.T. Shute should not engage or be interested in ginning cotton or buying cotton seed or seed cotton, cotton seed meal, or hulls for the said period of ten years on the north side of Bear Skin creek in said county nor on the site of the gin plant which he was then operating near the railroad depot in Monroe, which he agreed to remove and did remove.

176 N.C. at 463, 97 S.E. at 392. Since these limitations regulate the behavior of the purchaser they correspond to the restrictions on VIL's re-entry into the U.S. and Canadian market. Plaintiff J.R., the vendor, sought enforcement of the provisions regulating the business of J.T., the vendee.

While we are obviously not bound by a North Carolina state court's pronouncements during the Wilson administration, its analysis so effectively foreshadows our own that we generously quote the relevant language. The court distinguished those cases that upheld territorial restrictions as reasonable restraints incident to business sales as being fundamentally different because each "was brought by the vendee in order to protect the good-will which had been conveyed as an essential element of the business which he had bought." 176 N.C. at 464, 97 S.E. at 393. Unlike those cases, *Shute* analyzed an "attempted restriction on the vendee, which could not protect the good will of the business, bought by him." 176 N.C. at 465, 97 S.E. at 393. That distinction led the court to conclude that

> the division of the territory is not for the purpose of conveying to the defendant the right to obtain all the patronage of the establishment which the plaintiff sold to the defendants, but for the purpose of shutting off competition....

176 N.C. at 464, 97 S.E. at 393.

We employ that same logic in declaring the restraints on VIL unreasonable. Again, they cannot have protected good will purchased for consideration because VIL had no presence in VASP's exclusive territory—the United States and Canada. As we have previously indicated, considerable uncertainty exists as to exactly why the restrictions on VIL were included (rec., August 12, 1988, at 9) ("Perhaps when the agreements were negotiated, it was more a concept of economic symmetry"). In the absence of a legally sufficient rationale, we cannot enforce those restrictions on VIL.

The first of three possibilities, which we have now rejected, is that in recognition of the legitimate protection of good will furthered by the restrictions on VASP, this court could enforce all the agreements. But there are two other possibilities as well. One is that, in recognition of the inappropriateness of the restrictions on VIL, this court might refuse enforcement completely. Finally, we could enforce only those restrictions which separately survive scrutiny.

As was noted from the bench, our early impression was that the "various obligations are severable." *Id.* Separate agreements, all negotiated incident to the MBO but with individual terms and conditions, contain each of the various restric-

tions. Further, both Marketing Agreements explicitly describe how the parties agreed to severability. In relevant part that section reads as follows:

> Each covenant and undertaking shall be read and construed independently of the other covenants and undertakings herein contained so that if one or more should be held to be invalid as an unreasonable restraint of trade or for any other reason whatsoever then the remaining covenants and undertakings shall be valid to the extent that they are not held to be so invalid. While the covenants and undertakings are considered by the parties to be reasonable in all circumstances if one or more should be held invalid as an unreasonable restraint of trade or for any other reason whatsoever but would have been held valid if part of the wording thereof had been deleted or a period thereof reduced or the range of activities or area dealt with thereby reduced in scope the said covenants and undertakings shall apply with such modification as may be necessary to make them valid and effective.

(§ 10.04 (VIL to VASP) and § 10.05 (VASP to VIL)). The below discussion of reasonableness therefore evaluates only the restrictions on VASP, the restrictions on VIL having been severed as invalid restraints of trade. VASP is, however, afforded some measure of protection, as the limitation on VIL's use of VASP know-how are held *infra* to be legitimate in the U.S. and Canada.

The MBO intended to relieve VASP of financial difficulties while establishing VIL as an independent company. VASP received approximately $9 million in direct payments and elimination of liabilities, while VIL gained access to technology and know-how. The MBO also transferred VASP's international good will to the newly independent VIL. According to the EEC, "[t]his sale agreement was therefore

just one element in a *package* the effect of which ... was to put VIL in the place Verson International Ltd. (Delaware) occupied as the overseas 'alter ego' of VASP and not just in the place of VIL London" (EEC letter, ¶ 10 (emphasis in original)).[8] We conclude that the restrictions upon VASP were ancillary to a legitimate business purpose.

### B. *Reasonableness*

So as to prevent the bootstrapping of anti-competitive conduct onto an otherwise desirable transaction with legitimate purposes, the restrictions incident thereto must be reasonable. To invoke First Amendment jurisprudence by analogy, those restraints must be carefully tailored to serve the interest purportedly furthered, *cf. Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980) (invalidating order of public service commission that prohibited utility from including in monthly billing envelopes an insert discussing controversial issues of public policy because the "regulation [was not] a precisely drawn means of serving a compelling state interest"), or at least they must not be more restrictive than necessary for the purpose as to time, product and territory, *Alders v. AFA Corp. of Florida*, 353 F.Supp. 654 (S.D.Fla.1973), *aff'd without opinion*, 490 F.2d 990 (5th Cir.1974). In particular, we evaluate the durational, product, and territorial scope of the restrictions.

#### 1. *Durational Scope*

How much time would VIL require to establish itself as a full-fledged market participant subsequently able to compete head-to-head with Allied? The durational scope inquiry centers on whether five years reasonably answers this question.

As we have previously discussed, VIL needed to expand its manufacturing capa-

---

8. By its own terms, the VASP/VIL License Agreement states:

 This License has been made and delivered contemporaneously with the sale by Verson of all the issued share capital of Licensee and thereby in effect all of the business assets and

 property of Licensee and subsidiary companies through which Licensor has operated its business outside the United States and Canada.

 *Id.* at § 6.03.

bilities and make sales to establish credibility and create a reputation apart from VASP and Littell. According to VIL, engineering expertise and equipment costing approximately 1.5 million pounds had to be acquired before it could effectuate the rights purchased under the MBO (Kelleher aff. ¶ 53). VIL also estimates prototypes of the scroll sheeting line technology would not be available until September 1989. Only then could VIL begin to cultivate a reputation by effectively customizing features, shipping and installing on time, and creating a product devoid of problems. This justification—the creation of good will independent from the seller—not only typifies the legitimate interests which territorial restrictions safeguard, but also requires a certain duration during which that good will can be cultivated:

> The question in every case is whether the restraint is *reasonably calculated to protect the legitimate interests of the purchaser in what he has purchased,* or whether it goes so far beyond what is necessary as to provide a basis for the inference that its real purpose is the fostering of monopoly.
>
> * * * * * *
>
> It was not unreasonable for Syntex, in attempting to give itself breathing space to build up its own business in the product, to insure against the possibility that Reid–Provident might relabel the product, circularize its old customers to advise them of the change, and attempt to continue its business much as before.

*Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 315 F.Supp. 45, 56–57 (S.D.N.Y.1970), *aff'd,* 437 F.2d 566 (2d Cir. 1971) (emphasis added) (citation omitted).

Though we are slightly uncomfortable deciding whether five years—as opposed to three, four or six—are necessary to accomplish these objectives, the chosen period appears "reasonably calculated to protect the legitimate interests of the purchaser in what he has purchased." *Id.* at 56. Only a single year is left to run of the original five-year term and that duration directly relates to the time apparently necessary to reverse engineer scroll sheeting technology (Johnson dep. at 52).

We also take comfort in the EEC's opinion letter:

> Bearing in mind (a) that the market is quite competitive, (b) that the technology is evolving, and (c) that VIL's R & D facilities were, according to the investment bank financing the sale, limited, a reasonable period of time free from competition by VASP is considered necessary to enable VIL both to consolidate itself with the VASP clientele and to develop R & D facilities. *Five years is, in all the circumstances, considered necessary.*

(EEC letter, ¶ 5) (emphasis added). That analysis seems persuasive enough and we therefore hold the original five-year term to be reasonable.

VIL also requests the license term be extended an additional two years. At the present time we are unwilling to interfere with the five-year term. Through the use of injunctive relief VIL has twice been able to secure technology by court order and VIL will receive damages for whatever transgressions of legitimate territorial restrictions have occurred. Accordingly, extension of the five-year period would be unwarranted.

### 2. *Product Scope*

■ The purchaser of a business can contract for protection from competition by the seller only in those product markets where the seller operated at the time of the sale—where the seller had already accumulated good will. Allied claims that since VIL had never manufactured Littell scroll sheeting lines prior to the MBO, the restrictions incident thereto cannot regulate Allied's position in that market. But Allied's contention ignores VASP's participation in the scroll sheeting business in the VIL territory. In describing the Littell/VIL relationship prior to the MBO, Allied's David Knapke admits that

> [w]e were selling Littell product, and we were getting assistance from VIL. In some cases, we solicited business on our own. In other cases, they did support

our efforts in different parts of the world.

(Rec. 3/30/88 at 240).

### 3. Territorial Scope

■■■■ The standard for territorial reasonableness differs only slightly. The purchaser of a business can contract for protection from competition by the seller only in those regions where the seller operated at the time of the sale. Put another way, the territorial allocation must directly relate to protecting good will—the legitimate purpose of covenants not to compete. With these formulations in mind, Allied contends the agreements are geographically over-broad and therefore unreasonable. We evaluate the degree to which the chosen territorial allocation furthers the legitimate purposes of the MBO.

VIL submits its presence "both before and after the MBO in all countries and territories where advancing industrialization makes a market for VASP and Littell products" (brief in supp. of VIL's cross-mo. for sum.jdgmt. and in opp. to Allied's mo. for sum.jdgmt. on the sale of a business issue, at 15). Demand for scroll sheeting lines appears to require the existence of a canning industry, the presence of which depends on advancing economic development. This economic reality permits VIL to contend it "actively sold VASP and Littell equipment in every industrialized nation of the world in which a demand for scroll sheeting lines existed." [9] (Id. at 14.)

With this claim we have no quarrel. Allied does not appear to disagree either but, instead, emphasizes that at the time of the MBO Littell's overseas scroll sheeting line business was concentrated in Europe (Allied's mem. in supp. of its mo. for sum. jdgmt. at 10).[10] This contention significant-

ly impacts on the reasonableness inquiry. VASP entered into the MBO for relief of financial difficulties. In consideration, it agreed both to limit its own operations geographically and to enter into reciprocal licensing agreements with the spun-off international company—VIL. These conditions apply with equal force to VIL, the parent, and Littell, the subsidiary.[11] Territorial agreements to protect VIL's purchase of good will are therefore reasonable in those areas where VASP and Littell were already present and had established business contacts. VIL's acquisition of Littell's good will in Europe can therefore be legally protected through restraints on the seller proscribing re-entry into that market.

But the restrictions at issue are not limited to Europe. They instead divide the globe into two domains: the U.S. and Canada belong to VASP (now Allied), and the rest of the world is the exclusive domain of VIL. No attempt was made to limit the restrictions to areas in which VASP/Littell had created good will. Viewed in this light, the restrictions seem more like an agreement between competitors to divide up the world than a temporary geographic allocation incident to a sale of business. We have questioned that breadth before— "For example, it is difficult for me to see why VIL, as an emergent European company, has to secure a promise by a United States company not to compete in Mexico in order to become established" (rec. 8/12/88 at 8)—and we hold today that these territorial restrictions are not "as *limited* as is reasonable." *Lektro–Vend*, 660 F.2d at 265 (emphasis added).

To conclude that both parties perceived that VASP/Littell might have expanded throughout the world would be to read out the reasonableness requirement. Put an-

---

**9.** VIL lists the following in its 12(f) statement: "VIL (including subsidiaries acquired after the MBO) has completed at least one sale of some sort in all industrialized countries of the world except Ivory Coast, Kenya, Tanzania, Chile, Czechoslovakia, Syria, Yemen, and those to which VIL is prohibited from selling under U.S. law such as Vietnam." VIL's Local Rule 12(1) [sic] Statement relating to VIL's Motion for Summary Judgment on the Sale of a Business Issue, at ¶ 37.

**10.** Both sides agree that Littell also had significant business within the United States and Canada.

**11.** That was the central holding of our prior order requiring the sharing of Littell technology.

other way, merely allocating the entire non-U.S./non-Canada market to VIL cannot automatically render the territorial allocation reasonable. There must be some demonstration that VIL needs protection against VASP/Littell's appropriation of good will it sold to VIL, if it should reenter the market, and the record does not demonstrate such a need beyond the confines of Europe.

Allied also argues that the chosen method of deciding in which territory a particular sale falls is unreasonable. The agreements specify that wherever the equipment will be physically used dictates which firm possesses the right of first refusal (§ 3.01 of both the VASP to VIL and VIL to VASP Agreements). It was pursuant to these provisions that VIL warned Littell that customers for scroll sheeting lines to be used other than in the United States and Canada are customers of Verson. The descriptions do not, as Allied argues, regulate the disposition of scroll sheeting lines after their sale, for the purchaser has unbridled discretion in choosing exactly where to manufacture. Instead, the provisions merely define and assure enforcement of the territorial restrictions. In their absence Allied could effectively circumvent the territorial allocations by arranging for their overseas sales physically to take place in the United States or Canada.

But physical location seems chosen without regard to whether legitimate interests are thereby protected. The critical inquiry concerns *where the* relevant *decision is made.* The answer directly relates to whether the good will for which each side contracted remains protected. Allied/Littell should not be permitted to persuade European decisionmakers to purchase Allied/Littell goods, as Europe represents the center of the prior VASP's good will. Consequently, we incorporate that notion generally to establish the locus of decisionmaking respecting a particular order as the determining factor.

Again, the inappropriate territorial scope of the agreements does not necessarily result in voiding them in their entirety. "[R]egardless of arguable overbreadth, most modern courts will uphold a covenant to the extent that a breach of the covenant has occurred within a reasonable geographic area and time period, and, where applicable, with respect to a product reasonably related to the legitimate purpose of the restraint." *Lektro–Vend Corp.,* 660 F.2d at 267 (invoking, *e.g., Alders v. AFA Corp. of Florida,* 353 F.Supp. 654, 658 (S.D.Fla. 1973), *aff'd without opinion,* 490 F.2d 990 (5th Cir.1974)); *see also* Blake, *Employee Agreements Not to Compete,* 73 Harv.L. Rev. 625, 674 (1960); Bork, *supra,* at 223–24. Further, Section 10.04 of the VIL to VASP Marketing Agreement explicitly describes how the parties agreed to severability *on these very grounds.* That language is so dispositive it bears repeating:

> While the covenants and undertakings are considered by the parties to be reasonable in all circumstances if one or more should be held invalid as an unreasonable restraint of trade or for any other reason whatsoever but would have been held invalid if part of the wording thereof had been deleted or a period thereof reduced *or the range of activities or area dealt with thereby reduced in scope* the said covenants and undertakings shall apply with such modification as may be necessary to make them valid and effective.

*Id.* (emphasis added). We therefore will enforce the agreement in part. For the duration of the five-year period Allied is prohibited from competing with VIL in Europe, though the companies should compete without restriction elsewhere in the VIL territory.

### C. *Impact on the Seller and the Public*

Allied contends that enforcement of the restrictions would unduly oppress Littell because the latter has developed customers throughout VIL's territory. For example, Littell has purportedly been warned that the Nestle Company wishes to deal only with it and not with VIL in all relevant geographic markets. We presume Allied fears Littell will be left with nothing should Nestle be forced to choose between splitting its purchases or taking its entire business elsewhere. Allied further argues that the scroll sheeting line market is virtu-

ally saturated in the United States and Canada, and submits Littell's lack of orders therein as additional proof. Because scroll sheeting lines are the only product on which Littell realizes profit, Allied contends enforcement of the contractual restrictions would be unduly oppressive.

This same line of reasoning purportedly demonstrates why the restraints are contrary to the public interest. Allied submits the affidavit of the president of the VASP subdivision as evidence that enforcement would not only force Littell to fire 40 skilled employees but would also compel the closure of the firm's entire operations (German aff. at ¶ 3).

Were these claims proven correct, we would be compelled to take notice. *See generally Restatement* (Second) of Contracts § 188 comment c (the harm caused to the seller and the public may be too great were it to necessitate complete withdrawal from the business). But we cannot help but notice the degree to which Mr. German speculates on what can best be described as a worse case scenario. We reproduce paragraph 3 of the German affidavit in its entirety:

> *Should* Littell be restricted for an *extended* time period to selling its scroll sheeting lines only to customers for use in the United States and Canada, it will be forced to close down *that part* of its operations and lay off approximately 40 employees directly involved in the manufacture of scroll sheeting lines. Fear of this prospect *may be* a *motivating factor* leading Littell employes to accept employment with VIL. It *may not* be possible for Littell to reobtain the employee skills necessary to resume the manufacture of scroll sheeting lines following a *hiatus*. Littell *may be* forced to close its Chicago plant and terminate its 240 employees.

*Id.* (emphasis added). It is conceivable that each of these hedges might have, by itself, sufficiently discounted the probability of harm to the seller and the public so that we would be willing to enforce the restrictions notwithstanding the attendant risks. For example, there is no indication that the "extended period of time" or "hiatus" contemplated by Mr. German correlates to the remaining duration of the restrictions at bar. Further, Webster defines "may" as "possibility" (Webster's New World Dictionary 373 (paperback edition) (1984))—a far cry from certainty. Even more telling, however, is that the cumulative effect of German's efforts to qualify his conclusion comes close to reducing to zero the significance of counsel's claim that "[i]t is *likely* Littell ultimately *would be* forced to close its operations to the detriment of the public" [12] (Allied's 12(e) stmt. and mem. in sup. of mo. for sum.jdgmt. at 15 (emphasis added)). In essence, Allied/Littell attempts to invoke its own miscalculation of the scroll sheeting market's direction—Littell's self-proclaimed principal product—to escape contractual obligations to which it readily assented for valuable consideration. Such circumstances require a more substantial showing of detrimental impact on the seller and the public interest.

We also note how enforcement of the restrictions may well redound to Allied's benefit. While Allied has identified 21 scroll sheeting lines with a sales value of approximately $25 million that it hopes will result in orders within the near future, VIL has stated it can only accept contracts for between 4 and 8 of these prior to the expiration of the agreements. Notwithstanding that Allied "denies that it is *highly probable that all 21* scroll sheeting lines prospective sales will result in orders" (Allied's 12(f) stmt. in resp. to Rule 12(1) [sic] stmt. relating to VIL's mo. for sum.jdgmt. on sale of business issue, at 24 (emphasis added)), we think Mr. German probably understates the degree to which the remaining orders will flow to Allied/Littell. Even if less than three-quarters, say 15, result in orders, VIL would provide between 7 and 11 orders from its exclusive territory. Ac-

---

12. For example, were a particular event impossible without the presence of four separate variables each of which occurs 50% of the time, the event's frequency is much less than one would expect. In fact, the resulting probability would only be $.5^4$ or .0625. And to the extent that "may" represents a frequency less than .5, the probability would be reduced even further.

cording to Mr. Kelleher, even the low end of the range would represent a 300% increase over shipments made by Littell outside of the United States and Canada prior to the MBO (Kelleher aff. ¶ 58). That Littell has recently received considerable scroll sheeting orders further suggests that its business will survive during the duration of the restrictions.[13]

In supplemental submissions Allied contends that at least one of Mr. German's fears—that the territorial restrictions might encourage leading Littell employees to accept employment with VIL—has actually come true. Allied isolates the departure of Mr. Hartley Sangerman as proof of its suffering from an industry-specific "brain drain." [14] But the legal status of a complicated matrix of agreements negotiated incident to a multi-million dollar management buyout surely cannot turn on the employment status of a single employee, no matter how prominent in the field. A few defections cannot seriously put in dispute the factual underpinnings of Allied's economic viability and the subsequent impact on the public interest.

Allied also alleges the uncertainty surrounding this litigation has permitted VIL to threaten Allied employees. In particular, Allied contends that VIL notified employees such as Mr. Sangerman of its intent to allege violations of the territorial allocations and claim both compensatory and punitive damages against those employees in their individual capacities. We

cannot speculate exactly why former Littell employees such as Mr. Sangerman chose to change positions, nor do we know how difficult they will be to replace.[15] But we herein ensure that the obligations of each party will be clear from this point on, and any further employment changes will be made in light of this holding.

We therefore cannot find that the interests of the seller and the public necessitate judicial annulment of the restrictions at bar. Our decision to enforce the territorial allocations only partially makes that conclusion even clearer. Allied can pursue business outside of Europe, generating revenues and providing opportunities to employees it alleges would otherwise leave.[16]

In sum, we hold that those provisions restricting VIL from the United States and Canada are invalid (save for activities using VASP know-how, as we will hereinafter discuss). We further hold that VASP can be prohibited from competing with VIL in Europe, though both firms should compete directly elsewhere

## III. The Licensing of Know–How Rationale

We again review the separate inquiries mandated by *Lektro–Vend*, with an eye toward the law particularly applicable to licensing agreements. As a general matter, most of the rationale applicable to restrictions incident to business sales also applies to those incident to know-how agreements. As one commentator noted:

---

**13.** We see no reason to evaluate the degree to which VIL was instrumental in Littell's obtaining orders for installation of scroll sheeting lines in Indonesia, Taiwan, and Poland. Mr. Kelleher's affidavit notes that, for whatever reason, those orders are being filled by Littell.

Were these purchasers only now entering the market, this court's ruling would permit both Littell and VIL to compete for the Indonesian and Taiwanese orders, and VIL would have a right of first refusal in Poland.

**14.** Allied also maintains that VIL's hiring Mr. Sangerman and others renders the protection afforded by the territorial allocations unnecessary. That conclusion, assuming it is not only correct but also verifiable (dubious assumptions), misses the point. The appropriate test centers on whether the restraint was reasonable

when written. To view subsequent events as determinative would penalize that party which exercised better business judgment. Where Allied submits no support for its position, we cannot adopt such an awkward holding.

**15.** Allied notes only that replacing Mr. Sangerman will be a "challenge" (mo. to supple. Allied Prod., Corp.'s mo. for sum.jdgmt. at ¶ 3).

**16.** Allied's own submissions suggest the same: "Littell is justifiably concerned that this 'brain drain' might continue and inflict further irreparable harm if Littell is not given the opportunity to compete *in some part of the world outside of the United States and Canada*" (Allied Prod. Corp's repl. to VIL's resp. to Allied's mo. to supple. at 3) (emphasis added).

It is difficult to conceive how the disclosure of know-how under a restriction as to, say territory, would have substantial adverse effect upon competition in the market place if, for example, the licensor and licensee were not previously competitive and the licensee would not have been in the business at all but for such license.

Wolfe, *Restrictions in Know How Agreements*, 12 Antitrust Bull. 749, 767 (1967). While there are few cases addressing territorial restrictions incident to the licensing of patents and/or know-how, even fewer evaluate restraints pertaining to several processes and products. It does seem clear, however, that "[a]mong the ancillary restraints which are considered reasonable, both under common law and the Sherman Act, are those which limit territory in which the contrasting parties may use the trade secret." *United States v. E.I. DuPont de Nemours & Co.*, 118 F.Supp. 41 (D.Del.1953), *aff'd*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (citations omitted).

■ Ancillarity to know-how agreements does not automatically immunize territorial restraints, however. *See, e.g., Northrop Corp. v. McDonnell Douglas Corp.*, 498 F.Supp. 1112, 1122 (C.D.Cal.1980). Rather, the inquiry is considerably more complex. We evaluate the reasonableness of the know-how agreements by focusing on the characteristics of the information therein exchanged and how the provisions regulate it.[17] Because the two licensing agreements here at issue benefit different parties and concern distinct know-how, we evaluate each within the *Lektro–Vend* framework.

At least one court has directly addressed the question of how to determine whether particular restraints upon a know-how licensee should be permitted. In *Shin Nippon Koki Co. v. Irvin Indust. Inc.*, 1975–1 Trade Cases [CCH] ¶ 60347 (N.Y.Sup.Ct. 1975), the court isolated the criteria by which to determine whether those types of restraints are ancillary:

... a territorial limitation upon the licensee's sale of products made by use of the secret process should be considered "ancillary" if: (1) the subject matter of the license is substantial, valuable, secret know-how; (2) such restraint is limited to the "life" of the know-how; *i.e.*, the period during which it retains its secrecy; and (3) such restraint is limited to those products only which are made by use of the know-how.

*Id.*, at 66440.

Allied attempts to distinguish *Shin Nippon* because the restrictions there at issue benefitted the licensor, whereas here one licensing agreement limits the activities of VASP and the other limits VIL. But this distinction fails in light of the theory behind the *Shin Nippon* decision. *Shin Nippon* upheld the restrictions because "the rationale for permitting a licensor to 'reasonably' restrain its licensee is that 'since the owner of a secret process, so long as he keeps it secret, is entitled to use it or not, with immunity from the antitrust laws, he should be encouraged to make it available for the benefit of the public at large.' " *Id.* at 66440. Because the innovator should be given "a satisfying reward for his creative skill and diligence, he should be allowed to place reasonable competitive restraints upon those who ... but for the grant, would be unable to compete with him." *Id.* *Shin Nippon* held that the restrictions on the licensee's use of the trade secret were therefore permissible. *Id.*

Both parties seem implicitly to consent to employing the *Shin Nippon* criteria to evaluate the VASP/VIL licensing agreement. The dispute instead centers on their application to the VIL/VASP document which limits Allied/VASP activity. That agreement envisions development of VIL know-how to improve pre-existing VASP/Littell technology. In such circumstances, the *Shin Nippon* criteria would apply: (1) the VIL improvements would constitute "substantial, valuable, secret know-how"; (2) the territorial restraint limiting Allied's efforts would extend only to

---

17. Because the impact on the seller and the public directly relates to the territorial and product scope of the restrictions, we do not

repeat that discussion from above. We invoke the above analysis of the third prong of our test—the impact on the seller and the public.

the end of the existing five-year period, presumably less than the "life" of the know-how; and (3) the territorial restraints would be limited to only those products which are made by use of the VIL-developed know-how/improvement. *Id.*

While this court is not legally bound by the *Shin Nippon* criteria, we employ them to help define whether the restrictions at bar are reasonable per *Lektro–Vend.* The second *Shin Nippon* element determines whether the duration of the restriction is reasonable, and the first and third assist the evaluation of the product scope.

### A. *Duration*

 At the time of the MBO, VIL had never manufactured a scroll sheeting line. VIL negotiated for and received the right to this technology in the VASP/VIL Licensing Agreement. The duration inquiry closely tracks the analysis with respect to patents—restrictions in a patent licensing agreement cannot extend beyond the duration of the patent. *See, e.g., United States v. National Lead Co.,* 63 F.Supp. 513, 524 (S.D.N.Y.1945). Know-how licenses differ only slightly. With respect to the VASP/VIL Licensing Agreement, our inquiry reduces to one fairly simple question: does Article Five's five-year term represent a reasonable period of time to develop a capacity to produce a technology that could effectively compete in the market with Littell.

We answer that question in the affirmative. VIL's Ken Johnson estimates that it would take approximately 4½ years to reverse engineer Littell's scroll sheeting lines. Mr. Basta, a former general counsel of VASP, confirms that the lack of capacity necessitated the five-year term in which VIL was to "establish engineering" [18] (Bas-

ta dep. at 36–37). Allied's contention that it needs discovery on this matter cannot be genuine. As the leading producer of scroll sheeting lines worldwide, it would know if the required time were less than 4½ years. Its failure to submit a counter-affidavit from one of its engineers is therefore dispositive. *See R–T Leasing Corp. v. Ethyl Corp.,* 494 F.Supp. 1128, 1139 (S.D.N.Y. 1980) ("A vague claim of the need for additional discovery, unsupported by any basis in fact, is an insufficient ground upon which to oppose a motion for summary judgment"). We therefore hold that the duration of the restraint approximates the "life" of the know-how.[19]

With this, the EEC agrees. At paragraphs 5 through 7 its letter concurs that the five-year period was reasonably necessary for VIL to "enable VIL both to consolidate itself with the VASP clientele and to develop R & D facilities." *Allied Products Corp./Verson International Group Ltd.,* at ¶ 5.

The inquiry differs with respect to the VIL/VASP Licensing Agreement. From one perspective, the five-year period contained in Article Five seems, at best, to mirror the term of the VASP/VIL version and, at worst, arbitrary. From the other, the "life" of any newly-developed know-how which meets the other two *Shin–Nippon* criteria would surely be longer than what remains of the original five-year term. We prefer to take the latter view. Taken together, the criteria would limit the coverage of the territorial restrictions only to products made by using substantial, secret and valuable know-how gained from VIL. Those restrictions seem to regulate so few products that we cannot rule them invalid *per se.* In the unlikely event that some transgression might arise, we choose

---

18. As at the preliminary injunction stage, we find Mr. Basta's testimony particularly persuasive "since he was intimately involved in putting the deal together when it happened" (rec., 8/12/88 at 5).

19. We are reluctant to assign substantial legal significance to the statements of various individuals involved in the financing end of the MBO. For example, Mr. Neal of Citicorp Venture Capital claims that access to new VASP technology

over the full 5–year period was a fundamental factor in the Citicorp decision to support the MBO. To the extent that financing anticompetitive arrangements makes good business sense, Mr. Neal's claim does little to assist our inquiry. *Cf., United States v. Timken Roller Bearing Co.,* 83 F.Supp. 284, 310 (N.D.Ohio 1949) (in order for the Sherman Act to assist the free flow of commerce, good business purposes cannot justify restraints of trade).

instead to evaluate at that point the reasonableness of the restrictions contained in the VIL/VASP Licensing Agreement as applied to the alleged breach.

### B. Product Scope

Allied admits that some of the know-how included in the VASP/VIL License Agreement is secret and valuable, and that these proceedings have taken place is nearly proof enough. Allied twice expended considerable resources resisting VIL's efforts to gain preliminary equitable relief to compel the transfer of technology. We also consider it clear that VIL cannot effectively compete in the international market without access to Allied/Littell technology. To the extent that such know-how can make or break an international competitor, we think it obvious that the technology in question has substantial value. We also add that VASP/Littell admitted as much in stamping its drawings "Confidential" (Kelleher aff. ¶ 14). And while we always remain leery of assigning too much weight to the parties' own characterization of facts with legal significance, we are comfortable here with an admission against interest which merely reinforces our previous conclusions.

Allied contends the technology at issue cannot be secret and valuable because the agreements specify that each party has the right to use the technology royalty-free upon the expiration thereof. While superficially appealing, that argument is far from compelling. The limited durational scope of the royalty terms makes clear that the overriding purpose of the entire matrix of Licensing and Marketing Agreements was to ensure that VIL became a viable competitor after a five-year period in which to establish its independence. These agreements should not be scrutinized more strictly merely because the parties chose a shorter term than was legally permissible.

■ This conclusion stands apart from VIL's contention that Allied is estopped from questioning the License Agreements because it paid valuable consideration for the rights and obligations thereunder. The notion of "assignor estoppel"—that "an assignor should not be permitted to sell something and later to assert that what was sold is worthless," *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir.), *cert. dismissed,* —— U.S. ——, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988),—is inapposite. By their terms, the agreements restrict considerably more than just secret and valuable information. Allied is not estopped from arguing that the scope of the agreements is over-broad.

In relevant part, Article Two of the VASP/VIL Licensing Agreement provides:

> For and in consideration of the payment of the Fees provided in Article Four by Licensee [VIL] to Verson [VASP] and subject to the terms of this License Agreement, Verson grants to Licensee the exclusive right and license to Manufacture, use and sell the Equipment in the Territory which is covered by the Patents and/or by utilizing the Know–How; and Verson grants Licensee the Exclusive right and license to use the Trademarks in connection with the sale of Equipment in the Territory.

(License Agreement (VASP/VIL) § 2.01.) Allied misstates the overbreadth problem by claiming the definition of equipment contemplates too much. In context, the License Agreement limits the exclusive rights only to that equipment either "covered by the Patents and/or by utilizing the Know–How." [20] *Id.* As such, only some of the equipment outlined as § 1.01 would be subject to exclusive rights.

Because equipment "covered by the patents" and "right and license to use the Trademarks in connection with the sale of Equipment" both involve legally protectable interests, the overbreadth issue instead

---

**20.** We somewhat reluctantly note that interpreting the contract was considerably more difficult due to what we can only describe as poor and perhaps grammatically incorrect phraseology. As written, it is not at all clear either what is "covered" by the Patents and/or by utilizing the "Know–How" or what is "in the Territory." And while we are confident that our interpretation is correct, we are equally certain that some other description would have more concisely conveyed the desired meaning.

centers on exactly which know-how is "substantial, secret, and valuable." That some of the products at issue were created with "substantial, secret, and valuable" information does not validate restrictions on more pedestrian goods. The "decisive inquiry ... [is] whether or not the *bulk* of the inventions licenses had, or were expected to have, any appreciable royalty value." *United States v. Imperial Chemical Indust. Ltd.*, 100 F.Supp. 504, 528 (S.D.N.Y. 1951) (emphasis added).[21]

Again, we are reluctant to rule the restrictions invalid *per se* because they are legitimate with respect to some products. For example, it is perfectly appropriate to restrict VIL's use of Allied's transmat technology in the United States and Canada— Allied's exclusive territory. The same would be true of restrictions on VIL's use of Allied's scroll sheeting technology. But the territorial allocation is legal only as applied to those products made by use of patents, trademarks and "substantial, valuable, and secret" know-how. During the remainder of the five-year term we choose instead to evaluate on a case-by-case basis disputes pertaining to particular applications of the restrictions where the parties cannot agree.

The same applies with respect to the territorial allocations respecting the technology transferred from VIL to VASP (VASP/VIL License Agreement § 1.07), presumably, improvements to material previously shared by VASP. We do not declare those restrictions *per se* invalid, but instead evaluate the know-how, patents, and trademarks therein restricted on a case-by-case basis.

*Shin Nippon*'s third criterion, namely whether the restraints relate only to those products made by use of the know-how transferred, presents another difficult question. Allied contends that the License and Marketing Agreements are over-broad because they cover the products of after-acquired companies such as Bronx Engineering. VIL contends the court addressed this dispute at the preliminary injunction stage by holding that the term "equipment" encompasses all product lines in existence at the time of the sale (rec., 8/12/88 at 5).

We think the definition of "affiliate" is dispositive. Within the meaning of the Licensing and Marketing Agreements, that term includes after-acquired companies to the extent they manufacture product lines existing at the time of the MBO. The critical determination centers on whether a particular *product* was produced by VASP *at that time* (and, therefore, VIL acquired, by the agreements, VASP "know-how" which it now seeks to capitalize upon in the VASP territory). Either by saying that a new product line is not restricted or that products not using VASP "know-how" are not restricted, we reach the same result. If a particular technology were developed afterwards, the restrictions would not apply.

■ Defining the scope of the agreements in such a fashion effectively safeguards the parties' expectations. To hold otherwise would permit circumvention of the original agreements. As we held earlier,

> VASP did have every right, however, to expect that VIL would not spin off manufacturing to a new entity and claim that the new entity was wholly outside the constraints and obligations of the agreements.

---

**21.** The naked allegation that some patents covered by the licensing agreements might be no longer in force cannot suffice in rendering the product scope overbroad. At a minimum, Allied (the owner of the patents and know-how at issue in the VASP/VIL Licensing Agreement) would need to identify a particular patent or type of know-how which had made its way into the public domain. Furthermore, this focus misses the point: the License Agreements cover products, not information. And manufacturing even a single product most often requires the use of several patents and/or pieces of know-how. In such circumstances mere possession of information relating to a single component is unhelpful. Thus, Allied would need to demonstrate that, for a particular product, all such information had made its way into the public domain. Given that Allied is in the best position to make such a showing, and that it has not even attempted to isolate a single patent which has become public, its contention is without merit.

(Rec., 8/12/88, at 7). The same problem applies with equal force to subsequent acquisitions. Were VIL to acquire another entity which directly competed with Allied in VASP's exclusive territory, and were VIL permitted to continue that competition in product markets in which VASP participated at the time of the sale, the purpose of the original agreements would be frustrated. We instead enforce the original restrictions against every then-existing product within the definition of equipment then produced by VASP. Only by so interpreting the restrictions at issue can the intentions of the parties be safeguarded.

## C. Territorial Scope

Because the impact on the seller and the public directly relates to the territorial and product scope of the restrictions, we do not repeat that discussion from the sale-of-business section. We there hold that those impacts are insufficient to render the restrictions invalid. That those same territorial allocations are also incident to the licensing of technology, is mostly irrelevant.

At this point we merely evaluate the territorial allocations with an eye to the rationale which legitimizes those restrictions as incident to the licensing of know-how. That justification was succinctly articulated by the Justice Department guidelines:

> [R]estrictions such as exclusive fields of use and exclusive territories may be used to encourage the licensee to make investments that are necessary to develop and promote the licensed technology by protecting the licensee against free-riding on those investments by other licensees or perhaps even by the licensor.

International Operations, Antitrust Enforcement Policy, Trade Reg.Rep (CCH) No. 24, at 67 (November 10, 1988). Reciprocal restrictions limited on the one hand to the United States and Canada and to Europe on the other is well within the ambit of justifiable constraints.

## CONCLUSION

For the foregoing reasons, plaintiffs' summary judgment motion respecting count V and the amended counterclaim is granted in part and denied in part. The marketing restrictions on VIL's activity in the United States and Canada extend only to its use of VASP "know-how" in that territory. The marketing restrictions on Allied will be enforced only in Europe.